## No. 11,928.

### HESSICK, ET AL. v. MOYNIHAN, ET AL.

Decided December 12, 1927.

Action under declaratory judgment act, to test the validity of chapter 142, S. L. '27, concerning prison made goods. Judgment for plaintiffs.

*Affirmed.*

1. STATUTES—*Repeal.* While repeals by implication are not favored, they must be recognized where the legislative intent to substitute a new law for an old, upon the same subject, is clear.

2. *Repeal.* Where a new law covers the whole subject matter and is intended as a substitute for a former statute, it will be deemed a repeal of the earlier act.

3. *Prison Labor—Repeal.* When the legislature created the Colorado board of corrections by chapter 52, S. L. '15, it impliedly abolished the state commission on prison labor created by chapter 201, S. L. '07.

4. *Construction.* Courts will not so construe statutes as to lead to absurd results.

5. *Construction—Legislative Motive.* In the construction of statutes, courts will not attribute to the legislature improper motives in passing the acts.

6. PRISON LABOR COMMISSION—*Board of Charities—Merger.* The contention that the prison labor commission created by chapter 201, S. L. '07, was merged in the board of charities and corrections, overruled.

7. STATUTES—*Construction—Public Officials.* The practical construction given to a statute by the public officials charged with the performance of duties in connection therewith, is always entitled to consideration in cases of doubt.

8. *Prison Labor—Validity.* Chapter 142, S. L. '27, concerning prison labor held void as an attempt to amend a repealed statute, and as repugnant to section 11, article 2 of the state Constitution forbidding the passage of any law impairing the obligations of contracts.

9. CONSTITUTIONAL LAW—*State Contracts.* The constitutional prohibition against legislation impairing the obligations of contracts, protects from violation the contracts of states equally with those entered into between private individuals.

10. *Penal Institutions.* The reformatory and penitentiary are creatures of the Constitution, not of the general assembly, and legislative acts concerning them must be construed accordingly.

11. *Legislation—Penal Institutions—Police Power.* The passage of chapter 142, S. L. '27, the effect of which is to deprive the penitentiary and reformatory of valuable property rights acquired by convict labor and to make it a criminal offense to put such property to its lawful and natural use, held not to be a valid exercise of the police power of the state.

12. *Legislative Powers—Impairment of Contracts.* While the general rule is that one legislature can not bind the hands of its successor, a provision contained in a statute enacted by one legislature which is acted upon by private citizens and incorporated in a contract between them, may not be repudiated by a succeeding legislature.

*Error to the District Court of Chaffee County, Hon. James L. Cooper, Judge.*

Mr. WILLIAM L. BOATRIGHT, Attorney General, Mr. RALPH L. CARR, Assistant, for plaintiffs in error.

Mr. HORACE N. HAWKINS, Mr. HORACE N. HAWKINS, JR., for defendants in error.

*En Banc.*

MR. JUSTICE ADAMS delivered the opinion of the court.

MOYNIHAN, et al., defendants in error, as members of the Colorado board of corrections, brought a friendly action in the district court against plaintiffs in error, Hessick, as district attorney in and for the eleventh judicial district, and General Boatright, as attorney general of the state of Colorado. It concerns a matter in which all of the parties have a vital interest in their

official capacities. It was brought under the declaratory
judgment act (L. 1923, p. 268). The plaintiffs prayed
that a declaratory judgment be entered, construing an
act of the 1927 General Assembly (L. 1927, ch. 142 at
pages 540, 541), and determining that it is invalid and
not the law of the land, and for general relief. The
plaintiffs prevailed and the defendants bring the case
here for review. We shall refer to them as aligned
below.

One of the claims urged by plaintiffs is that the 1927
act is void because it purports to amend a section of an
old chapter that they say does not now exist, it being
section 4 of chapter 201, p. 508, L. 1907 (sec. 783, C. L.
1921). Plaintiffs' contention is that this section of the
1907 act has been repealed, not expressly, but by im-
plication. From this they conclude that there is nothing
to amend, and so, they claim, the 1927 act is a nullity.
Other grounds of attack upon the 1927 act are made.
They will be referred to later. Many legislative enact-
ments subsequent to 1907 are cited to support the theory
of implied repeal. They are found in the session laws
of 1915, 1921 (2 acts), 1923, 1925, and one in 1927 in
addition to the other 1927 act specifically challenged in
the complaint. The most important of these are the
one enacted in 1915 and one of those in 1921. Before
proceeding further, we shall briefly set forth, in chrono-
logical order, all legislative acts referred to, for con-
venient reference. They are as follows:

(a) Laws 1907, p. 507, ch. 201, C. L. 1921, secs. 780 to
791 inclusive. It is entitled, "An act concerning the
employment of prisoners confined in the state peniten-
tiary and the state reformatory of this state." It pro-
vides, among other things, that all prisoners at the peni-
tentiary or reformatory shall be employed under rules
to be established by a commission hereinafter designated;
that the board of commissioners of the penitentiary
(3 in number), and the warden of the penitentiary, the
warden of the reformatory, the secretary of the state

board of charities and corrections, and the governor of the state, shall constitute the commission, with "full power. and authority to carry into effect to its fullest extent the provisions of this act." The commission shall be known as the state commission on prison labor. The act also provides for the teaching of trades to convicts. Section 4 of the chapter is the same as section 783, C. L. 1921, amended or attempted to be amended by the 1927 act. Section 783 reads as follows: "The state commission on prison labor are hereby authorized and directed to cause to be manufactured by the convicts in the state penitentiary and the prisoners in the state reformatory such articles, including wearing apparel, as are needed and used therein and also such as are required by the state, including articles and materials to be used in the erection of buildings. All such articles manufactured in the state penitentiary and reformatory and not required for use therein may be furnished to the state, or for or to any public institution owned or managed and controlled by the state, at and for such price as shall be fixed and determined as herein provided, upon the requisition of the proper officials, trustees and managers thereof. No articles so manufactured shall be purchased from any other source, for the state or the public institutions of the state, unless said state commission on prison labor shall certify that the same cannot be furnished upon such requisition, and no claim thereof shall be audited or paid without such certificate."

The next section, 784, C. L. 1921, provides for requisitions for supplies to be made to the commission; section 785, that the commission shall establish the prices of labor and materials, including articles used for repairs and construction, furnish a form for requisitions, and a system of accounts; classify the buildings, offices and institutions of the state; determine designs, styles, and qualities of manufacture in the penal institutions of the state. Section 786 provides for allowance to prisoners for good conduct, and for pay, forfeitures and

fines; section 787, for the dispositions of moneys from fines; section 788, as to when prisoners may draw pay. Section 789 calls for monthly reports from the respective wardens of the penitentiary and reformatory, to be made under oath and forwarded to the state commission on prison labor. Section 790, that said wardens shall make and forward to the commission, estimates of supplies needed, "which commission may approve, alter or revise the same." Section 791 gives the prison commission authority to advertise for bids, "within the appropriations which may be placed at its disposal by the state," and to make contracts, etc.

The above statement of the 1907 act is not intended to be complete in detail, but only to state who were the seven officers of the state commission on prison labor, and to give a birdseye view of their sweeping powers and duties, and also to quote section 783 of the act, mentioned in the 1927 statutes.

(b) Chapter 52, p. 153, 154, L. 1915, is entitled, "An act creating the Colorado board of corrections, defining its powers and duties and repealing all acts in conflict herewith." Section 1 of this chapter is the same as section 536, C. L. 1921, and is still in force. It creates the Colorado board of corrections, consisting of three members from different congressional districts, not more than two of whom shall be of the same political faith. They are to be appointed by the governor, for a term of six years, under conditions named in the act. They are given a salary and traveling and other expenses. Under section 2, "The board shall have the full control, management and supervision" of the insane asylum, the penitentiary and the reformatory, "and over the property, grounds and buildings of the said institutions." The board is also vested with and required to perform the duties of the state board of lunacy commissioners and the board of penitentiary commissioners, subject to the restrictions upon such boards. The two last named boards are abolished by the act. Section 3, ch. 52 of the

1915 act reads: "All acts and parts of acts in conflict herewith are hereby repealed."

(c) Laws 1921, pages 216–223, ch. 85, (C. L. § 537, et. seq.) is entitled, "An Act concerning the Colorado Board of Corrections, defining its powers and duties, and concerning the management of the institutions under its control and the government and discipline of the inmates thereof." Section 1 (C. L. § 537) reads: "The Colorado board of corrections shall have the full control, management and supervision of the Colorado state hospital * * * the Colorado state penitentiary * * * and the Colorado state reformatory * * *; and over all property, grounds and buildings of said institutions; and shall make all necessary rules and regulations for the government, management, police and discipline of said institutions." Under section 2 (C. L. § 538) the members of the board are required to take oath and give bond; the state treasurer is ex officio treasurer of the board; the board shall hold monthly meetings, or oftener when required. Section 3 (C. L. § 539) provides for the salaries of the wardens of the penitentiary and reformatory, and for their subsistence under the direction of the board; also concerning a parole officer of the reformatory. Section 4 (C. L. § 754) for the organization of the penitentiary, under the control of the board. Section 5 (C. L. § 778) similarly as to the organization of the reformatory under such control. Section 6 (C. L. § 540) for the purchase of supplies. Section 7 (C. L. § 767) for work by convicts on highways and streets and alleys, on the order of the board. Section 8 (C. L. § 580) for appointment by the board of a superintendent of the Colorado state hospital, and for an assistant, also for physicians, nurses and attendants. Section 10 (C. L. § 542) for biennial reports from the board to the governor, showing expenditures and estimates for the next period. Section 11 (C. L. § 543) calling for levies and appropriations. Section 12 (C. L. § 572) about reports from the board or warden to the governor, concerning insane

prisoners and the action to be taken. Section 13, p. 222 of the 1921 act, repeals section 2, ch. 52, L. 1915, relating to the control of the Colorado board of corrections over the institutions named in such section, but section 1 of the 1921 act, (C. L. § 537) continues and amplifies the powers of such board. (See recital thereof at beginning of this paragraph.) This act of 1921 declares an emergency, and provides that such act shall take effect at once.

(d) Laws 1921, ch. 78, p. 190, relates to the service of sentences of convicts. This is mentioned here only as indicating the legislative recognition of the responsibilities and control of the Colorado board of corrections concerning such matters, indicated in the act.

(e) Laws 1923, ch. 169, p. 593, abolishes the state board of charities and corrections, repeals certain sections, and also provides that the secretary of such board shall be known as the secretary of the department of charities and corrections, with all rights and powers (if any) of the secretary and the old board. This act is referred to only because such secretary was designated as one of the members of the state commission of prison labor. (See par. a above.)

(f) Laws 1925, ch. 141, p. 405, as amended by L. 1927, p. 191, relates to the manufacture of license plates in penal institutions, under the direction of the state board of corrections. This is mentioned here for the same purpose as in paragraph d above.

(g) Laws 1927, ch. 78, p. 259, gives additional powers to "The Colorado board of corrections, as created by the session laws of 1915, page 153 thereof." (C. L. § 536.)

(h) The following is the act the passage or attempted passage of which caused the present controversy. It is chapter 142 at pages 540 and 541, L. 1927. It is entitled, "An act concerning goods, wares or merchandise produced or manufactured by convicts of the state penitentiary or state reformatory of Colorado, and prohibiting the sale of such goods in the state of Colorado, and pro-

viding penalties for the violation thereof.'' It reads as follows:

"*Be It Enacted by the General Assembly of the State of Colorado:* That Section 783 of the Compiled Laws of Colorado, 1921, be amended to read as follows:

"783. The State Commission on prison labor are hereby authorized and directed to cause to be manufactured by the convicts in the State Penitentiary and the prisoners in the State Reformatory such articles, including wearing apparel, as are needed and used therein, and also such as are required by the State, including articles and materials to be used in the erection of buildings. All such articles manufactured in the State Penitentiary and Reformatory and not required for use therein may be furnished to the State, or for or to any public institution owned or managed and controlled by the State, at and for such price as shall be fixed and determined as herein provided, upon the requisition of the proper officials, trustees and managers thereof. No articles so manufactured shall be purchased from any other source, for the State or the public institutions of the State, unless said State Commission on prison labor shall certify that the same cannot be furnished upon such requisition, and no claim thereof shall be audited or paid without such certificate. Except as hereinabove provided, no articles, goods, wares or merchandise so manufactured, or produced on farms, shall be sold or offered for sale within the State of Colorado or in competition with similar articles, goods, wares or merchandise manufactured, or produced on farms, by any person, persons, firms or corporations operating or carrying on a manufacturing business within the State of Colorado and employing free labor.

"Penalty: A violation of any provision of this Act shall be punished by a fine of not less than $300.00, nor more than $1,000.00, or imprisonment for not less than three months nor more than two years, or by both such fine and imprisonment, in the discretion of the court.''

Unless otherwise distinguished, references hereafter to the 1921 act will mean chapter 85, p. 216, et seq., described in our paragraph "c" above, and not the one in paragraph "d." Likewise reference to the 1927 act will relate to chapter 142, p. 540, et seq., above quoted in this paragraph "h."

(i) In addition to the above matters appearing in the statutes, certain facts of a public nature, which plaintiffs contend bear upon the construction of the act, appear of record, mostly by stipulation and partly by evidence. The creation of the state commission on prison labor under the 1907 act has always been regarded as a dead letter by the legislative and executive branches of the state government since it was passed. It is not referred to in any subsequent act, and no state appropriation of money has ever been made for the maintenance of such commission. It has never held a session, has not done any business, nor issued an order of any kind. That which is here stated of the public officials in failing to recognize the existence of the prison labor commission is not said in the sense that one might speak of a law violated or disregarded, but as of a statute universally considered to have no real existence, because fully covered by other laws. This attitude of the public officials has been unanimous, and has continued unbroken for twenty years, during alternate changes in administration, and regardless of the various political beliefs of such officials.

(j) In addition to the above silent attitude toward the prison labor commission, it has been affirmatively slighted as unworthy of notice by the executive and legislative departments of the state since the act creating it was passed in 1907, in that its functions have been performed by other boards. In 1915 the act creating the Colorado board of corrections was passed. In 1921, its powers and duties were greatly enlarged, as indicated both by the title and body of the act. (L. 1921, p. 216, ch. 85.) Other responsibilities devolved upon the new

board from time to time, through subsequent legislation above referred to. Successive state governors have appointed its members; plaintiffs constitute the present board, and biennial appropriations have been made to carry on its work; it has been one of the active administrative boards of the state ever since it was formed, after its officers were appointed by the executive.

(k) As to some of the work done under the management and control of the Colorado board of corrections, first, at the reformatory: It is situated at Buena Vista, in an agricultural valley, not adapted to industrial or manufacturing enterprises. Formerly, the inmates who were not usefully employed were guilty of gross violations of the rules; the members of the Colorado board of corrections, to improve discipline, devised a program whereby the imprisoned could be habitually and healthfully employed. Pursuant thereto, the plaintiffs leased ranches on a crop share basis, without expense to the state, the state and the landowners receiving a share of the crops raised through the labor of the inmates of the reformatory. Business on a large scale was engaged in, consisting, in particular, in the raising of live stock, including dairy cows and other cattle and also sheep; pure bred registered herds were purchased, with the approval, aid and support of prominent members of cattle and sheep associations of the state; vouchers were drawn by the board, approved by the state auditor, and paid by the state treasurer, the latter being also ex officio treasurer of the board of corrections. These bills were also ratified and approved by the state auditing board, composed of the governor, secretary of state, attorney general, state auditor and treasurer. The chief purpose of plaintiffs' program was for the reformation of the inmates of the reformatory, the making of money being only an incident. In addition to live stock raising, extensive farming operations have been conducted, including the raising of lettuce and many other farm and garden products. The reformatory and other state insti-

tutions have been supplied, and surplus products sold on the market. The business has been successful, the health and discipline of the prisoners improved, the services of 16 guards dispensed with, and morale at the reformatory stimulated, tending to make inmates good citizens upon their release. All of the lands so acquired were leased prior to the passage of the 1927 act. In 1925 and 1926, the plaintiffs deposited with the state treasurer over $40,000, the result of such industries, conducted without expense to the state, and these funds are used for the maintenance of the reformatory. The herds of live stock, so acquired, and which are now the property of the state, exceed in value the sum of $100,000, and if the plaintiffs are prohibited from selling them and other products of the reformatory, during the years 1927 and 1928, it will result in a loss to the reformatory of at least $75,000.

(1) The record shows a similar situation at the penitentiary. In 1925, the plaintiffs contracted for the purchase of a canning plant and a valuable 90-acre fruit and vegetable ranch adjacent to Canon City, where the prison is located; the farm is operated by prisoners and is to be paid for out of the profits derived from the operation, no state money being used. The canning plant comprises several large buildings, and prisoners are there employed; the earnings in 1925 and 1926 were $58,188. If the sale of surplus products be prohibited, almost 200 inmates of the penitentiary would be thrown out of employment. Other products, manufactured by prisoners, are mentioned. It is claimed by plaintiffs that if the act of 1927 is declared valid, it will result in a loss to the state in 1927 and 1928 of revenues in excess of $200,000. Moynihan, a member of the board, testified to this estimate. It was objected to as irrelevant, but was not contradicted. It is shown that these advantages so acquired, both in property and property rights, will be lost to the state if the 1927 act be upheld, and that

prison discipline will become more difficult and the health of the inmates impaired.

(m) The most important facts above related are agreed to in the stipulation of the parties. These parties on plaintiffs' side consist of the three present members of the Colorado board of corrections, in which board the legislature has vested the "full control, management and supervision" of the penitentiary and reformatory. The defendants are two in number: the district attorney in the eleventh judicial district, in which district the penitentiary is located, and next, the attorney general of Colorado. The defendants qualify their admissions by saying that they do not admit the legal effect of the facts admitted, which of course is proper, for the ultimate determination of such legal effect rests with the court. Such officers also exclude from their stipulation any prediction as to what will happen in the future if the 1927 act be declared invalid.

All of the above legislative acts are taken from our session laws or compiled laws. All other statements are based upon the record, where they appear in fuller detail.

1. With the above sworn officers of the state in substantial accord as to most of the material facts, we cannot well imagine more authentic sources of information for the court to act upon. It gives us confidence in the background from which we shall attempt to draw correct legal conclusions.

2. Most of the principles of statutory construction that we shall make use of here are summarized in *People v. Morgan,* 79 Colo. 504, 246 Pac. 1024, where the constitutionality of another act of the general assembly was involved. They are somewhat numerous, and to avoid unnecessary repetition, we shall simply direct attention to that case. None of these principles are disputed by the parties. Their disagreement lies in the construction to be placed upon them in their application to the case at bar.

3. As to implied repeals, we quote with approval from *People v. Capp*, 61 Colo. 396, 158 Pac. 143, wherein it is said at page 401: "While repeals by implication are not favored, they must and should be recognized where, as here, the legislative intent to substitute a new law for an old one upon the same subject is clear. * * * This court has repeatedly recognized and sanctioned the doctrine of repeals by implication, as indicated in the following cases: *Lovelace v. Tabor*, 29 Colo. 62, 66 Pac. 892; *People v. Lange*, 48 Colo. 428, 110 Pac. 68; *Sugar City v. Commissioners*, 57 Colo. 432, 140 Pac. 809."

In *Shaff v. Shaff*, 72 Colo. 184, 186, 210 Pac. 400, we held that where a new law covers the whole subject matter, and is intended as a substitute for a former statute, it will be deemed a repeal of the earlier act.

4. We hold that when the legislature created the Colorado board of corrections by the 1915 act, (see par. "b" above) it impliedly abolished the state commission on prison labor, formed under the 1907 act. (Par. "a" above.) Our reasons for this are manifold; we shall state some of them.

5. It was manifestly the intention of the legislature to substitute the new for the old, and to give to the new board like powers theretofore exercised by the old, as well as new and enlarged duties, as indicated in the 1921 act and subsequent legislation. The board of corrections is given the "*full* control, management and supervision" of state institutions previously claimed to have been under the control of the old board. In saying this, we are not confusing (as we believe was done in the briefs) the legal entities of the old commission and the new board with their several duties. The old commission under the 1907 act may be likened to a discharged servant, whose master has employed a new man, to whom similar and new tasks have been assigned, with additional responsibilities and marks of his employer's confidence. But the similarity of the servants' duties, of course, does not make them the same person. This con-

struction is wholly in keeping with the quotation from *People v. Capp, supra,* and the other authorities above.

6. To hold that two boards exist would lead to absurd results. Courts will not so construe statutes if it can be avoided. The existence of the Colorado board of corrections is not denied; it has been functioning for many years. It has been judicially recognized as one of the administrative boards of the state. *State Board v. Denver,* 61 Colo. 266, 156 Pac. 1100. If the old commission and the new board both exist, it follows that we have two great administrative boards created by the same power, each charged in many respects with the same tremendously important duties and responsibilities, with conflicting jurisdiction over the same subject matter, and each entitled by law to make their own rules and to issue opposing orders. A more perfect instance of a ''house divided against itself'' can scarcely be imagined. Such tactics would destroy an army. Criticism, whether just or unjust, has not infrequently been directed against systems, state and federal, that call for numerous administrative boards. But to suppose that the legislature has created two to do the work of one, is to attribute to it an improper motive, which courts will not do. *People v. Morgan, supra.* We are not to be understood as suggesting a legislative policy; we are only applying old rules to ascertain the intention of the general assembly.

7. A further reason for holding against the theory of the continued existence of the prison labor commission is the fact that Laws 1915, p. 154, sec. 2, expressly abolished the board of penitentiary commissioners, of whom there were three, and Laws 1923, p. 593, sec. 1, abolished the state board of charities and corrections. The three penitentiary commissioners and the secretary of the board of charities and corrections were ex officio members of the prison labor board. See paragraph ''a'' above. The latter board, comprised of seven men, lost four members by the above acts of 1915 and 1923. We

take this, in connection with the fact that the prison labor commission has never been mentioned in any statute since 1907, and that its membership was thus depleted, its powers never exercised, and its work reassigned to a later board, is a strong indication that the legislature looked upon the prison labor commission as we do, that it is dead.

8. The suggestion that the old commission was merged in the new board, or vice versa, cannot be entertained. None of the statutes so state, or give any such intimation; the two are different in names; one was created eight years before the other; one was given seven heads, the other three; their terms of office do not correspond; membership on the old commission was ex officio, by certain public officers, but on the board of corrections, appointments to office come from the governor, with the approval of the senate; the members of the old commission were not directed to give bond, except such as may have been required for the performance of their duties in their other public offices; whereas, members of the Colorado board of corrections are each required to give a bond in the sum of $5,000 for the faithful performance of their duties. These combined facts are enough to convince us that the old commission and the new board were separate and distinct entities, especially as the old one has never functioned and the new one has.

9. Chief Justice Hayt, in delivering the opinion of this court in *In re State Lands,* 18 Colo. 359, 367, 32 Pac. 986, said: ''The practical construction given to a statute by the public officers of the state, charged with the performance of public duties in connection therewith, is always entitled to consideration, in cases of doubt. In this case counsel concede that the conclusions which we have reached are in harmony with the construction that has been heretofore placed upon the provisions under consideration at all times by the officers of the executive department.''

The above is applicable here. As to the continuous construction placed by the executive and legislative branches on that part of the 1907 act that created the state commission on prison labor and gave it power, see paragraphs numbered "i" to "m" inclusive, above.

And in *Smith v. Smith,* 61 Colo. 71, 156 Pac. 148, we held that long usage is of potential effect in the construction of a statute.

10. The above brings us again to a consideration of L. 1927, pages 540 and 541, the particular object of plaintiffs' fire, and which act they seek to have declared void. As we have seen, the 1927 act purports to amend section 783, C. L. 1921, which is the same as section 4, L. 1907, p. 508. But the latter section relates to the state commission on prison labor, and to certain things that it is to do, whereas there is no such commission. When a statute is repealed by implication, the demise is of course as complete as if it had been expressly repealed, otherwise there could be no repeal at all by implication. That part of the 1927 act that purports to amend the 1907 act which expressly refers to such commission and its duties is therefore without any effect. In particular, we mean down to the words, "Except as hereinabove provided." We shall consider the latter part of the act separately; it is the object of plaintiffs' greatest concern, because it most vitally affects the Colorado board of corrections in the performance of their official duties. We cannot believe that the legislature intended to suddenly summon from the grave a defunct commission for the sole purpose of charging it with only such responsibilities as those contained in section 783. The statute was ineffective for such purpose.

11. Concerning the latter part of the act: It reads as follows: "Except as hereinabove provided, no articles, goods, wares or merchandise so manufactured, or produced on farms, shall be sold or offered for sale within the state of Colorado or in competition with similar articles, goods, wares or merchandise manufactured, or

produced on farms, by any person, persons, firms or corporations operating or carrying on a manufacturing business within the state of Colorado and employing free labor.''

The penalty, and full text of this 1927 act are to be found in paragraph ''h'' above.

It is claimed upon behalf of the part of the 1927 amendment above quoted, that it comes within the protection of the rule that ''If the statute be found to be partly constitutional and partly unconstitutional, and the invalid part is severable, the valid part may stand, while the invalid is rejected.'' *People v. Morgan, supra.* The rule of law is stated correctly, but it does not save the act, because the first part is ineffective and the second part is bad. As said in the same case, (79 Colo. 504, 508) ''Independently of any question of intent, a state enactment is void, if by its necessary operation it destroys rights granted or secured by the Constitution of the United States. *Brimmer v. Rebman,* 138 U. S. 78, 11 Sup. Ct. 213, 35 L. Ed. 862.'' To this quotation we now add the words, ''or rights reserved in the Constitution of the state.''

12. Constitutional provisions to which we now refer as being violated by the latter provisions of the 1927 act are as follows: ''No state shall   *   *   *   pass any *   *   *   law impairing the obligation of contracts.'' U. S. const. sec. 10, art. 1.

And it is provided in the bill of rights in section 11, article 2 of our state Constitution, ''That no   *   *   * law impairing the obligation of contracts, or retrospective in its operation,   *   *   *   shall be passed by the general assembly.''

If it were possible to look upon the operation of the 1927 act prospectively, we should do so, but in its necessary operation it conflicts with the above constitutional provisions. If it be enforced, it will compel the Colorado board of corrections to cancel its leases with third parties, and to cease operating the farms that it has

leased from third parties on crop shares, and to abandon them. It would also compel the board to shut down, or greatly curtail the output of the canning factory and of the fruit and garden tract, which it has agreed to pay for out of the proceeds of the sales of convict labor. These payments cannot be made if the 1927 act stands.

13. The citizen "should not be left to discover, 'coiled up in the folds' of an act apparently in no way concerning him, a provision affecting his most important interests." *In re Breene,* 14 Colo. 401, 404. When so "coiled" the danger is at least as great as, if not greater than, when it strikes openly. If the latter part of the 1927 act be enforced, the state officials will be made criminals if they carry out their engagements, lawfully contracted before that act was passed. It is void for this reason.

14. We are confining ourselves to the case before us, and it is to be read in the light of these facts. As to convict made goods and products of farms operated by prisoners, the general subject is limited by the record. We mean in its bearing upon the status of property rights of the state and individuals, existing when the act was passed, and its impairment of contracts theretofore made, and we intend no intimation of what our decision would have been in the absence of the prior acquirement of such rights. We are not, of course, referring here to the rights of convicts, but to those of the state and its citizens. Speaking in general terms, "The product of his (the prisoner's) labor is taken by the state, in payment of the cost of his maintenance." Tiedeman's Limitations of Police Power, p. 98, § 35.

15. The constitutional provision against the impairment of obligations of contracts "protects from violation the contracts of states equally with those entered into between private individuals." 1 Cooley's Const. Limitations, (8th Ed.) 558, citing *Fletcher v. Peck,* 6 Cranch 87, 136, 3 L. Ed. 162, and other leading cases. *People v. Hall,* 8 Colo. 485, 490, 9 Pac. 34, in which the

*Dartmouth College Case,* 4 Wheat. 518, 4 L. Ed. 629, is mentioned. It was said by Helm, J., in *People v. Hall, supra,* at page 490, that until the Supreme Court of the United States shall have retraced its footsteps, the conclusion will be accepted by us.

16. Whether men like to think so or not, reformatory and penal institutions will undoubtedly be necessary as long as the race endures; they are so now, and were so when the Constitution was adopted. Its framers recognized this universally known fact, and imposed upon the legislature a duty not only to establish such institutions, but also to support them. Section 1, article VIII of the state Constitution reads: "Educational, reformatory and penal institutions, and those for the benefit of the insane, blind, deaf and mute, and such other institutions as the public good may require, shall be established and supported by the state, in such manner as may be prescribed by law."

The point to which we are calling particular attention at this place is that the reformatory and penitentiary are the creatures of the Constitution, and not of the general assembly, and legislation affecting them must be regarded in the light of the above provision. That the word "support" means something more than the mere passage of biennial appropriation bills, would seem to be self-evident from the words that follow: "in such manner as may be prescribed by law." To show that this is the common acceptation, it is only necessary to refer to the 1915 act creating the Colorado board of corrections, and the 1921 amendment thereto, and numerous other enactments both before and since 1915 concerning the penitentiary and reformatory.

That the legislature has wide discretionary powers in determining the wisdom of proposed legislation, is well known, and the determination of the extent to which the state is able to support these institutions is also largely within the discretion of the general assembly. But with the above section 1, article VIII of the Constitution be-

fore us, we cannot say that it was a valid exercise of the police power to deprive the penitentiary and reformatory of $100,000 or more in property rights, lawfully acquired by convict labor without taxation or expense to the state, and to make it a criminal offense to put such property to its lawful and natural use. The effect of the act is such that large herds of pure bred live stock so acquired, shall be kept at state expense until they die of old age or until too old to be fit for ordinary use, unless they can be presently consumed in state institutions. We shall not inquire into the extent to which one arm of the government may point its sword at itself, or just how deeply it may pierce the breast of the state, however accidently done, but we will say that it cannot go beyond the shield of the Constitution.

17. The good faith of the legislature is not to be questioned, but it undoubtedly overlooked the fact that the 1927 act, chapter 142, injures no penitentiary or reformatory but those of our own state, and that notwithstanding its provisions, convict 'made goods and farm products from the other 47 states of the union may flood the markets of Colorado, for the act does not apply to goods or products of other states; the second clause refers to goods ''so'' manufactured or produced on farms, referring to the Colorado penitentiary and reformatory. This feature does seem to have at least a reflex bearing upon the question of the ''support'' of our own institutions; it is a marked withdrawal of support; it is destructive, not constructive as to the penitentiary and reformatory. It is possible that some one had in mind the decisions to the effect that convict made goods are articles of commerce, and that any legislative attempt, not a valid police regulation, to control interstate traffic in such goods is void under the commerce clause of the federal Constitution. 21 R. C. L. 1177, § 15 and cases there cited.

18. In 21 R. C. L. 1177, § 15, it is said: ''There is, in the nature of things, nothing wrong in prison made goods, nor are such goods unsanitary or inferior in

quality so as to make their sale without distinguishing marks a fraud on the public. The fact that convict labor is used in an occupation also pursued by persons not convicts does not degrade that occupation, nor is the fact that convict labor will compete with other labor a sufficient reason why convict labor should not be utilized. * * * It is not at all likely that this result ever had or can have any material or perceptible influence on wages. But even if it had, the welfare of the convicts and the interests of the taxpayers are proper subjects for consideration.''

As to convict made goods and products of farms operated by prisoners, we disclaim any purpose here to pass upon any sociological question as such, but the fact that such studies may be involved does not divest them of their legal aspects.

19. The general rule is that one legislature cannot bind the hands of its successors, but, as said by Mr. Justice Helm in *People v. Hall, supra* (8 Colo. 485, 496), ''We fully recognize the beneficent doctrine that one legislature cannot, in general, tie the hands of its successors. Our position is simply that a provision contained in the statute adopted by one legislature may, when accepted and acted upon by a private citizen or corporation, result in a contract which succeeding legislatures are powerless to repudiate.'' And, on page 492 of the same opinion, it is said: ''It is contended, however, that a *general* law is never a contract. This declaration may be true. It is, nevertheless, also true that sometimes when conditions have been accepted, and acts have been performed, or valuables parted with, thereunder, such a law constitutes a part of the contract, or is inseparably connected with the obligation thereof.'' The underlying principle in the Hall case is, with the decisions of the Supreme Court of the United States as its watchword, that it is as highly essential that a state, or those lawfully acting under its authority, shall be held to an honorable performance of their legal obligations,

as is required of private persons. We would not have it otherwise.

20. Plaintiffs claim that the subject of the 1927 act (p. 540) is not clearly expressed in the title as required by section 21, article 5, of the state Constitution. We regard it as unnecessary to answer this, for a belief either way would not affect the ultimate disposition of the case in view of the other constitutional objections which we hold are fatal to the validity of the act. The same may be said of other arguments concerning it, all of which have been ably presented by the several counsel engaged in the discussion of the important questions involved.

21. The primary purpose of this action is to obtain a declaratory judgment concerning Laws 1927, 540, 541. The 1907 act is involved only as to § 783, C. L. 1921. A reading of our opinion will show that we have carefully refrained from condemning the 1907 act as a whole, because as a whole it is not within the issues of the present case. The statement in paragraph "i" that the 1907 act has always been regarded as a dead letter by the legislative and executive branches of the government, is a statement of fact; it is not an expression of the views of the court. We have tried to make this clear at the end of paragraph "m." To and including such paragraph, the opinion is only a recital of the statutes and matters of record. From there on, beginning with paragraph numbered one, we have freely discussed our views of the law. Our only stricture in this case involving the 1907 act is that the state commission on prison labor has been abolished, and therefore as we have said in the 11th paragraph, above, the first part of the 1927 act "is ineffective." Beyond this, any final determination of the 1907 act as a whole would be purely obiter. Our disapproval of the latter part of the 1927 act is based on constitutional grounds.

22. The trial court held that the above act of the general assembly—Laws 1927, at pages 540, 541, ch. 142—

is void and of no effect. We approve for the reasons above stated.

Judgment affirmed.

MR. JUSTICE BUTLER and MR. JUSTICE DENISON dissent.

MR. JUSTICE BUTLER dissenting.

With some parts of the majority opinion, and with the final result, I cannot agree. One contention strenuously urged by counsel for the defendant in error is that the act of 1907 was impliedly repealed, and that the act of 1927 is void for the reason that it purports to amend a section of a repealed act. This seems to be the view of the majority of the court. If this is not so, it is difficult to understand how the majority could arrive at the conclusion that the act of 1927 is void in its entirety. The opinion refers to the prison labor act of 1907 as ''a statute universally considered to have no real existence, because fully covered by other laws.'' From this proposition and from the proposition that the act of 1907 has been impliedly repealed, I dissent.

In 1907, and for years prior thereto, the board of commissioners of the penitentiary was vested with the full control of the penitentiary and the state reformatory, including the power to employ the inmates in the erection of workshops and other buildings; and the wardens were given power to employ the inmates in such labor as may be most advantageous to those institutions, subject to the general control exercised by the board. Rev. Stat. of 1908, secs. 4824, 4832, 4837, 6247, 6259, 6260, 6262. In that year (1907) the general assembly passed the act of 1907, herein referred to as the prison labor act of 1907, providing for the employment of prisoners confined in the penitentiary and the reformatory. The act contains elaborate provisions for carrying out the purposes of the act under the control of a commission created by the act and named the State Commission on Prison Labor. All agree that the State Commission on Prison Labor was later abolished. All agree that the prison labor

act of 1907 never was expressly repealed. It is said, however, to have been impliedly repealed by subsequent legislation. Repeals by implication are not looked upon with favor. They are never recognized if there is a serious doubt concerning the legislative intent. *Rathvon v. White,* 16 Colo. 41, 26 Pac. 323; *Dunton v. People,* 36 Colo. 128, 87 Pac. 540. In *Wilson v. People,* 36 Colo. 418, 420, 85 Pac. 187, we quoted with approval the following statement of the law by Mr. Justice Field, in *United States v. Tynen,* 11 Wall. 88, 20 L. Ed. 153: "When there are two acts on the same subject, the rule is to give effect to both, if possible. But, if the two are repugnant in any of their provisions, the later act, without any repealing clause, operates to the extent of the repugnancy as a repeal of the first."

Upon him who asserts that a later act impliedly repeals a former act, in whole or in part, rests the burden of specifically pointing out such irreconcilable repugnancy. Nothing short of this will meet the requirement. Not one statute relied upon by counsel and cited in the majority opinion contains any provision that is inconsistent with or repugnant to the prison labor act of 1907, or any of its provisions, except with reference to a very few matters of administrative detail. The act of 1915 created the Colorado Board of Corrections, and conferred upon it full control of the penitentiary and the reformatory. The effect of this act was to transfer to that board the power therefore vested in the commission, and to abolish the latter. In all other respects, the prison labor act of 1907 remained unaffected by the act of 1915. The act of 1921 (Sess. L., chapter 85) stands in no different relation to the prison labor act of 1907, except that it provides that prisoners may be employed on road work under certain conditions. It prescribes the manner of purchasing supplies, and contains other matters of administrative detail that do not at all affect the question now before the court. The other act of 1921 (Sess. L., chapter 78) is even farther removed from the

question.  The act of 1925 relates to the manufacture of
motor vehicle license number plates by the inmates of
the penitentiary and the reformatory, and appropriates
money for that purpose.  This act is not only not repug-
nant to the prison labor act of 1907, but is in entire har-
mony therewith; indeed, it is a step toward carrying out
the purpose of that act, which is to employ in useful in-
dustry the inmates of the penitentiary and the reforma-
tory.  The act of 1927 (chapter 78) has no more bearing
upon the question before the court than has chapter 78
of the session laws of 1921.  These are the statutes re-
lied upon to establish a repeal of the prison labor act of
1907 in its entirety.  They fall far short of repealing it.
The contention that the abolition of a mere administra-
tive commission by conferring its powers upon another
administrative agency, called a board, repeals the act,
is untenable.  For example, a municipal corporation is
created by statute, with a mayor as its chief executive; a
later statute abolishes the office of mayor, and confers
his powers upon a commission.  The act creating the
municipality is not thereby repealed by implication.  To
claim that the abolition of the State Commission on
Prison Labor has the effect suggested, is to exaggerate
the importance of the commission.  The prison labor
act of 1907 was not passed primarily to create a com-
mission, and, as a mere incident to that purpose, to give
the commission something to do.  The purpose was to
establish what is known as the "State Use" plan.  There
has always been a controversy between free labor and
prison labor.  All recognize the regenerating influence
of work and the desirability of keeping prisoners em-
ployed in useful labor, not only in order that they may
have their time usefully employed, but also in order that
they may learn trades so that when they have served
their terms and are released from custody, they may be
qualified to earn an honest living.  At the same time, all
appreciate the fact that the products of prison labor sent
into the general market in unrestrained competition with

free labor may be seriously detrimental, and perhaps disastrous, to the latter. How to keep the prisoners thus usefully employed and at the same time not work a hardship upon free labor, is a problem not easily solved. As a result of much thought and many discussions, eminent penologists concluded that what is known as the "State Use" plan was a feasible compromise between the two conflicting ideas; that confining the market to the state institutions limited the field of competition, and reduced such competition to its least objectionable form. For several years such plan has been in operation in three of our most populous states, and perhaps in others.

It is said, in the majority opinion, that no appropriation has been made to carry out the provisions of the act. True. That accounts for the fact that the administrative board has not purchased machinery and carried on the activities provided for in the act. But that circumstance does not effect a repeal. Whenever an appropriation is made for the purpose, it will become the duty of the administrative board to carry out the provisions of the act. Why the legislature did not appropriate money to carry out the "State Use" plan, we are not advised. It may be that the splendid results achieved by the members of the state board of corrections in its management of the penitentiary and the reformatory, as described in the majority opinion, satisfied the legislature with the results achieved, and caused it to defer making appropriations to carry out the "State Use" plan until some time in the future when conditions may make such course desirable.

It is a mistake to suppose that the act was universally believed to have no real existence, or that the legislature has wholly ignored the act or considered it as having been repealed. The act appears in the Revised Statutes of 1908, which, the secretary of state certified, contained "all the general laws of the state." In 1919 the legislature passed an act (Sess. L., chapter 29) for the creation of a commission, charged with the duty of revising, consolidating, codifying, editing and preparing for publi-

cation "the general laws of the state of Colorado, as they shall *exist* at the time such commission shall file its report." The governor was required to appoint two competent attorneys at law as commissioners, and also to appoint one justice of the supreme court and two district judges to act with the commission in an advisory capacity. The commission was directed to omit from the compilation "statutes that are obsolete or *repealed * * * * * * or such portions thereof as *are no longer operative.*" The commission labored many months, and had the assistance not only of the advisory members, but also of a special advisory committee of the Colorado Bar Association. In its report, referring to the statute authorizing the compilation, the commission says (Preface to C. L.), "We have interpreted this mandate to extend to passing on all questions of *implied,* as well as express, repeal, and have omitted all acts and parts of acts which it was clearly the intention of later acts to annul." In 1921 the legislature (Sess. L., chapter 69) ordered the publication of the Compiled Laws, which had been prepared by the commission. Printed at the front is the commission's certificate that the volume contains "a full and correct text of the * * * statutes of Colorado." In the Compiled Laws (chapter XXV) is found the prison labor act of 1907, under the title, "Convict Labor and Goods." The legislature could not more clearly express its belief that the prison labor act of 1907 is a valid, existing statute. The fact that the board of corrections has not purchased machinery and tools and proceeded to manufacture goods for state use, has no bearing whatever upon the question of implied repeal. This is so for two reasons. The prison labor act (sec. 12) provides that such purchases shall be made by the administrative body "within the appropriations which may be placed at its disposal by the state"; and no appropriation has been made for the purpose of carrying out the provisions of the act. The board is not expected to do the impossible. Again, even if the board deliberately intended to ignore the act—and no such contention is

made—or overlooked it, or believed that it is no longer an existing law, the act would not thereby be repealed.

We come now to a construction of the prison labor amendatory act of 1927 (Sess. L., chapter 142), concerning which a declaratory judgment was rendered. There are two distinct parts. The first part consists of an exact copy of the section sought to be amended, section 4 of the prison labor act of 1907. This was included merely to comply with section 24 of article 5 of the state Constitution, which provides, "No law shall be * * * amended * * * by reference to its title only, but so much thereof as is * * * amended * * * shall be re-enacted and published at length." Including it in the amendatory act did not repeal original section 4.. The original section 4, included in the amendatory act, is regarded as having been the law ever since its enactment in 1907; it derived no new force from its inclusion in the amendatory act. *Callahan v. Jennings,* 16 Colo. 471, 27 Pac. 1055; *Kendall v. People,* 53 Colo. 100, 125 Pac. 586. Since the passage of the act of 1907, i. e., in 1915, the Commission on Prison Labor was abolished. The provisions of the 1927 act constituting the purported amendment are as follows:

"Except as hereinabove provided, no articles, goods, wares or merchandise so manufactured, or produced on farms, shall be sold or offered for sale within the State of Colorado or in competition with similar articles, goods, wares or merchandise manufactured, or produced on farms, by any person, persons, firms or corporations operating or carrying on a manufacturing business within the State of Colorado and employing free labor.

"Penalty: A violation of any provision of this act shall be punished by a fine of not less than $300.00, nor more than $1,000.00, or imprisonment for not less than three months nor more than two years, or by both such fine and imprisonment, in the discretion of the Court."

In the first part, the words, "Except as hereinabove provided," refer to the provision in the original section forbidding the purchase of certain articles for the state

or its public institutions, unless the State Commission on Prison Labor shall certify as stated in the section. By such reference, the provision requiring the certificate of the State Commission on Prison Labor is incorporated into and expressly made a part of such amendment, the same as though the amendment contained the words, "Except the State Commission on Prison Labor shall certify," etc., thus requiring such certificate before any of the products of prison labor could be sold within the state of Colorado, etc. This part of the amendment, if it became effective at all, became effective in 1927; but at that time there was no State Commission on Prison Labor in existence; it was abolished 12 years before. Hence, this provision is inoperative and void. If it had provided that no such sale shall be made except upon certificate of the Colorado board of corrections, it probably would have been valid.

The second part of the amendment is valid. The effect is to provide a penalty for the violation of any provision of the prison labor act of 1907. The amendatory act of 1927, therefore, is not void in its entirety. Section 12 of the prison labor act of 1907 makes the carrying out of the provisions of the act dependent upon legislative appropriation for such purpose. When, if ever, such an appropriation is made, this amendment will become important; until then, it, together with the rest of that act, will remain in a state of suspended animation. It is unnecessary to discuss the constitutional questions suggested in the majority opinion.

The judgment should be reversed; and this court should either render a declaratory judgment in accordance with these views, or remand the case to the lower court with the direction to render such judgment.

MR. JUSTICE DENISON authorizes me to say that he concurs in this dissenting opinion.

Note: Since this dissenting opinion was written, paragraph 21 has been added to the majority opinion. No change in the dissenting opinion seems to be necessary. Judgment affirmed.