No. 20489.

GAME AND FISH COMMISSION OF COLORADO, ET AL.
*v.* CLELAND N. FEAST, ET AL.
(402 P.2d 169)

Decided May 24, 1965.

304

Duke W. Dunbar, Attorney General, Frank E. Hickey, Deputy, Richard W. Bangert, Assistant, for plaintiffs in error.

Elmer P. Cogburn, Joseph A. Myers, Joseph D. Pender, James H. Howard, for defendants in error.

*En Banc.*

Mr. Justice Sutton delivered the opinion of the Court.

The parties appear here in the reverse order of their appearance in the trial court where plaintiffs in error, the Game and Fish Commission of Colorado, and E. G. Spurlin, State Controller, were defendants; and defendants in error, Cleland Feast, William Corlett, and Robert Merrick, were plaintiffs. We shall refer to them as they appeared below.

In the trial court plaintiffs sought a declaratory judgment and injunctive relief. In substance, they alleged in their complaint that they had purchased game and fish licenses; that their license fees were deposited in the Game Cash Fund, which was established pursuant to C.R.S. '53, 62-2-5; and that, therefore, they were interested parties as to the use and disposition of said Fund. Plaintiffs also asserted that by the terms of Sec. 1 of Senate Bill No. 130, Ch. 222, Colo. S.L. 1961, of Sec. 7 of Senate Bill No. 30, Ch. 77, Colo. S.L. 1962, and by virtue of 1960 Perm. Supp., C.R.S., Section 123-3-1, a tax is levied upon Game and Fish lands, and that the Colorado Constitution, Art. X, § 4, therefore, has been violated, in that said acts impose a tax on property owned by the State of Colorado, in contravention of the aforementioned constitutional provision.

In addition, plaintiffs alleged that unless defendants were restrained, they would expend money out of the Game Cash Fund to the damage and injury of plaintiffs and all other Game and Fish licensees in Colorado.

After a trial and hearing on the merits, the court ruled that the legislation in question was an attempt by the legislature to tax by indirection what cannot be taxed in direct fashion under Sec. 4, Art. X of the Colorado Constitution. In addition, the court ruled that inasmuch as Ch. 222, Colo. S.L. 1961, had expired prior to the time of the judgment, the constitutionality of that particular statute was a moot question.

The trial court entered a declaratory judgment in favor of plaintiffs, adjudging and decreeing that 1960 Perm. Supp., C.R.S., Section 123-3-1, was unconstitutional as it related to the Game and Fish Commission, and, further, it decreed that Sec. 7 of Senate Bill No. 30, passed by the 43rd General Assembly at its second regular session in 1962, was unconstitutional. The court ordered that the Game and Fish Commission be restrained from drawing and signing any vouchers on the Game Cash Fund for the purpose of paying the school fee, and that the State Controller be enjoined from honoring any such vouchers for such purposes.

The basic question confronting this court (after two subsidiary issues are determined as hereinafter mentioned) centers around the constitutionality of 1960 Perm. Supp., C.R.S., Section 123-3-1; or, stated another way, does 1960 Perm. Supp., C.R.S., Section 123-3-1, impose a tax on state owned property in violation of Art. X, § 4 of the Colorado Constitution?

The two subsidiary questions relate to whether plaintiffs are real parties in interest, and, whether all necessary and indispensable parties have been made defendants in the instant suit?

I.

We shall first consider whether plaintiffs are real parties in interest? We answer this question in the affirmative.

True it is that purchasers of Game and Fish licenses are not granted any vested interest, or any interest for that matter, in the Game Cash Fund by either a statute or our Colorado Constitution. In fact, the purchase of a Game and Fish license is simply a required payment to the state for the privilege of taking possession of game and fish which are *ferae naturae* within the state.

It is also true that "* * * a constitutional question can only be raised by one whose rights are infringed by the invalidity complained of." *Jackson v.*

*Denver,* 109 Colo. 196, 199, 124 P.2d 240 (1942); *Post Printing Co. v. Denver,* 68 Colo. 50, 189 Pac. 39 (1920); R.C.P. *Colo.* 17(a); 16 C.J.S., *Const. Law* § 76(a).

■ Plaintiffs, however, do have an interest in how their segregated license fees are spent. It is common knowledge, for example, that such funds are spent not only for regulation of the game and fish laws, but also to encourage the propagation of wildlife and fish so that they will be available to licensed sportsmen in meaningful quantities. In fact, the purchase of lands for the latter purposes and their removal from the tax rolls is what has brought about this very controversy. Obviously, if the Game Cash Fund is depleted by siphoning therefrom substantial parts thereof to counties in lieu of taxes for lands used for game and fish propagation and for hunting and fishing, there will be less money and less wildlife and fish for these plaintiffs and others like them. Thus, for that reason alone, they have an interest in how the money they pay is spent. They have the right, therefore, to question its expenditure by this action.

II.

As to the second subsidiary question it is asserted by defendants that the instant action is fatally defective because the State of Colorado was not made a party defendant. Defendants' assertion is based on *R.C.P. Colo.* 57(j) which, in pertinent part, provides:

"When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding. * * *"

■ There is no merit to defendants' claim in this regard for it ignores the fact that two agencies of the state government are parties defendant in this action and, indeed, are represented by the State Attorney General. In this type of action when suit is brought against an agency or department of the state government, it is

in effect against the state itself. Cf. *Farmers Irrigation Co. v. Game and Fish Commission,* 149 Colo. 318, 369 P.2d 557 (1962).

A good definition of "indispensable parties" is found in *Ducker v. Butler,* 104 F.2d 236, 238-39 (1939). In that case the court defined "indispensable parties" as those who have an interest in the controversy "of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience."

The general rule concerning those who must be joined as defendants is found in 67 C.J.S., *Parties* § 41, wherein it is said:

"The interest which a party must have in the subject matter in order to make him a necessary party defendant must be a present substantial interest, as distinguished from a mere expectancy or future contingent interest."

Defendants also assert that school districts, in the counties wherein the Game and Fish Commission owns real property, should have been made parties defendant. This assertion is similarly based on *R.C.P. Colo.* 57(j). Again, there is no merit to this contention.

A review of this record discloses that the only interest which various school districts could claim in the subject of this action, if they so desired, lies in the fact that the funds derived from the so-called "school fee," if validated, would be paid into their treasuries. Under the theory of defendants themselves, however, the school districts will lose nothing as a result of the judgment of the trial court in the instant action. This is illustrated by the language found at page 22 of their opening brief, to-wit:

"If these statutes are declared to be unconstitutional, the money from the Game and Fish Fund will not be paid to the county funds and the county funds, conse-

quently, will not distribute as much to the districts and, as a result, the State Public School Fund will be required to pay more to the districts."

### III.

As to the third and principal question, we deem it unnecessary to burden this opinion by setting forth the entire provision held unconstitutional by the trial court. It is sufficient to note only some of the pertinent language in the statute which renders it violative of the Colorado Constitution Art. X, § 4, which provides:

"*Section 4. Public property exempt.* — The property, real and personal, of the state, counties, cities, towns and other municipal corporations and public libraries, shall be exempt from taxation."

■ The underlying rationale of the above constitutional provision is well illustrated in 51 Am. Jur., *Taxation* § 560:

"The property of a state is exempt from the operation of its own tax statutes because, as the sovereign power, the state, through its officers or through the municipalities it creates, receives the revenue from the taxes levied and collected, and, from the means thus furnished, discharges the duties and pays the expenses of government. Its property constitutes one of the instrumentalities by which it performs its functions. Since every tax would to a certain extent diminish its capacity and ability, the courts have generally been unwilling to hold that such property is subject to taxation in any form * * *."

■ It is important to observe that 1960 Perm. Supp., C.R.S., Section 123-3-1, contains provisions which are made a part of the general tax laws wherein revenue is raised for the public schools. Indeed, the section in question is entitled "*Special school tax — inclusion of game and fish lands.* —" and contains the following pertinent language, to-wit:

"(1) On or before the day designated by law for the commissioners of each county to levy the requisite taxes

for the then ensuing year, the school board in each district shall certify to the board of county commissioners a statement showing the aggregate amount, which in the judgment of said school board, it is necessary to raise from the taxable property of said district, and from the payment of school fees by the game and fish commission as hereinafter provided, to create a special fund * * *. It shall thereupon be the duty of the county commissioners to levy, and to certify to the game and fish commission as to those lands and improvements thereon at the time of acquisition by the game and fish commission owned by the game and fish commission within the county, at the same time as other taxes are levied, such rate within the limits allowed by law, as will produce the aggregate amount so certified by the school board. The amount of such special tax, which shall be assessed to each taxpayer of such district, shall be placed in a separate column of the tax book, which shall be headed "special school tax. * * *"

"(2) It shall be the duty of the county assessor at the time that he values and assesses taxable property within the county, to value and assess each separate tract of land as owned by the game and fish commission, and also any improvements which may have existed on such land at the time ownership of said land was assumed by the game and fish commission * * *. It shall be the duty of the county commissioners at the time taxes are levied to certify to the game and fish commission as to those lands owned by the game and fish commission within the county, the amount owed by the game and fish commission as "school fees" which amount shall be determined at such rate of valuation and assessment as is applied in the levy of the "special school tax."

"(3) Upon receipt of a certification of school fees due from a board of county commissioners, the game and fish commission shall cause to have properly drawn and signed vouchers issued which the state controller shall

honor by issuing warrants upon the "game cash fund" * * *. The claim established by the certificate of school fees due by the respective counties shall constitute a preferred claim on the "game cash fund" * * *. The game and fish commission shall have all the rights and obligations as to valuation and assessment and as to the certificate of school fees due, before the county board of equalization, the state board of equalization and Colorado tax commission, as granted or imposed upon private taxpayers. * * *"

Turning our attention now to the language of the disputed statute, we find ourselves confronted by words of the type used to impose ordinary taxes on real property, words dealing with the manner of assessment, and words dealing with the valuation of ordinary lands. In addition, we note that the procedure of appeal to the County and State Boards of Equalization is similar to that granted to private taxpayers.

We are not impressed — nor should we be — by the fact that the levy is labeled by the legislature as a "school fee" rather than a school tax. See *Walker v. Bedford*, 93 Colo. 400, 26 P.2d 1051 (1933). In nearly all respects, this section levies a tax on State Game and Fish Commission property identical with the tax levied in each affected school district on private property. Therefore, we are in accord with the trial court's statement wherein it said:

"In our opinion, the legislation is an attempt by the legislature to do indirectly what cannot be done directly. It seems apparent that the proposed fees are to replace the taxes that had been paid by individuals who owned the property before it was acquired by the Game and Fish Commission. The fees, as shown above, are computed on an assessment based on the value of the property.

"The statutes contain no element of regulation or restraint pertaining to game and fish laws whereby it could be argued that they are an excise fee or tax. The

legislation, in our opinion, is for the primary purpose of raising revenue. When this is the case, the fee loses its character, as such, and becomes a tax for revenue. Although, the legislature uses the word "fees," the language of the legislature in denominating the nature of a tax or fee to be assessed is not determinative of its character. In our opinion, the fee being computed on an assessment based on valuation is a tax and is in violation of Article 10, Section 4 of the State Constitution."

 Defendants, however, contend that the statute under consideration does not impose an ad valorem tax on state owned property, but rather merely involves a *transfer* of funds from the Game Cash Fund to the school fund with a formula being spelled out on how to do so. In that regard, defendants submit that since there are no constitutional prohibitions against a transfer — and since the law in dispute only results, as a realistic matter, in a transfer — that plaintiffs are pursuing a moot cause. Such abstruse and inventive reasoning does not impress us. For here we are not dealing with what the legislature might have done, but with what the legislature did, in fact, do. The statute discloses no legislative intent to bring about a *transfer;* it merely — but significantly — levies a "school fee" on game and fish lands with a provision for a method of payment by the commission out of the Game Cash Fund. In brief, this statute is a Rube Goldberg contraption which grants legislative permission to school districts to tax state owned property. This the constitution expressly forbids.

 The apparent reason for failing to appropriate money from this fund is because of the existence of two federal statutes which bring about a federal contribution to the State of Colorado of a sum of approximately one-half million dollars annually under certain conditions. These two acts known as the Dingell-Johnson Fish Restoration Act, U.S.C.A., Title 16, § 777 (particularly subsections (a) and (b) of the same section) and the Pittman-Robertson Act, U.S.C.A., Title 16, § 669

(particularly subsections (b) and (c) of the same section) would cause Colorado to lose the aforesaid sums if, in fact, a *transfer* were accomplished as contended for. This is so because both of these Acts of Congress contain provisions which require a state to enact legislation accepting the provisions of the Federal Acts (as Colorado has done) and, further, require that each such state act "shall include a prohibition against the diversion of license fees paid by fishermen (or by hunters) for any other purpose than the administration of said State fish and game department * * *."

 In conclusion it can be noted that the school districts themselves could not effectuate any *transfer* of the funds in question nor could they levy any tax on the state owned lands in question.

The judgment and decree of the trial court adjudging and decreeing 1960 Perm. Supp., C.R.S., Section 123-3-1, unconstitutional as it relates to the Game and Fish Commission and restraining the Game and Fish Commission from drawing and signing vouchers on the Game Cash Fund for payment of a school fee and the State Controller for paying same, was proper and is hereby affirmed.

MR. JUSTICE FRANTZ, MR. JUSTICE MCWILLIAMS, and MR. JUSTICE SCHAUER dissent.

MR. JUSTICE FRANTZ dissenting:

I differ with the majority view that 1960 Perm. Supp. C.R.S., Section 123-3-1, imposes a tax on game and fish lands of the state in contravention of Article X, Section 4, of the Constitution of Colorado. In my opinion, the statute is not a tax measure. It is simply a device enacted by the General Assembly by which a transposition of funds is to be effected.

In essence, the legislature has created a channel by which a certain portion of the game and fish funds may be transferred to the county treasurers of the sev-

eral counties for the use of school districts. The determination of the amount to be thus transferred and the manner in which the act is to be accomplished are prescribed in the statute. It is with the manner of accomplishment—the procedure—that our differences spring. By pursuing the procedure outlined in the statute, is a tax imposed or are funds merely taken from one pocket of the state and put in another?

We are dealing with funds statutorily earmarked for it is provided in C.R.S. '53, 62-2-5, that all moneys received from fees, licenses, fines, and penalties, and from other sources "shall be deposited by the commission in the state treasury in a fund to be known as the 'game cash fund,' and shall be used by the commission for any expenditures authorized or contemplated by and not inconsistent with the provisions" forming the game and fish commission and vesting it with the administration of the game and fish laws. We are not concerned with funds earmarked for a certain purpose by the Constitution of this state.

Funds of the character in question are subject to the plenary power of the General Assembly. The General Assembly, under the Constitution, truly controls the purse strings of the state in all respects except where restrained by our Constitutions. "[A]s the power of the legislature to enact laws and prescribe the procedure for raising revenue to support the government, is *plenary,* except as limited by the inhibitions of the federal and state constitutions, no act of that department will be declared invalid unless its repugnance to the fundamental law *is clear and beyond reasonable doubt."* *Colorado Tax Commission v. Pitcher,* 56 Colo. 343, 138 Pac. 509. See *Weidenhaft v. Board of County Commissioners,* 131 Colo. 432, 283 P.2d 164.

It has been said of a revenue measure that, if it is susceptible of two interpretations, one of which brings it into compliance with, and the other in violation of, the Constitution, the former interpretation shall be

adopted. *Chicago, Burlington & Quincy R. R. v. School District,* 63 Colo. 159, 165 Pac. 260.

Statutes which are subject to interpretation should not be construed in such manner as to lead to absurd results. *People v. Rapini,* 107 Colo. 363, 112 P.2d 551, 134 A.L.R. 545; *Hessick v. Moynihan,* 83 Colo. 43, 262 Pac. 907. Again, legislation which is susceptible of interpretation should not be construed in such manner that it would result in attributing to the General Assembly an improper motive. *Hessick v. Moynihan, supra.*

"Except as limited by constitutional provisions, the legislative body of the state has absolute control over its finances." 81 C.J.S. States § 132, 1145. "[O]rdinarily the proceeds of tax levies (including license fees) may be appropriated to any public purpose, and * * * by successive legislative acts the appropriation of any particular tax levy may be changed from one public purpose to another in the uncontrolled discretion of the legislature." *State v. Bates,* 198 S.C. 430, 18 S.E.2d 346. "Except for funds pledged to the retirement of bonds and interest the funds are subject to the legislative will. The funds may be changed, or even abolished, and the funds therein transferred to other accounts or funds." *Reif v. Barrett,* 355 Ill. 104, 188 N.E. 889. See *Johnson v. McDonald,* 97 Colo. 324, 49 P.2d 1017.

Application of the foregoing basic rules to the problem at hand will lead unwaveringly to the conviction that the statute does not result in the imposition of a tax but effects a change of the funds of the state from one of its pockets to another.

By Article IX, Section 2, of the Constitution of this state, the General Assembly is directed to provide for the establishment and maintenance of free public schools throughout the state. It has been held that this provision is mandatory. *Duncan v. People,* 89 Colo. 149, 299 Pac. 1060.

In the consideration of our problem, we must remember that Article X, Section 4, provides that "the prop-

erty, real and personal, of the state, counties, cities, towns and other municipal corporations and public libraries, shall be exempt from taxation."

It becomes necessary to analyze 1960 Perm. Supp. C.R.S., section 123-3-1, in the light of the constitutional provisions and the rules of law and statutory construction adverted to hereinabove.

By subsection 1, the school board in each district "shall certify to the board of county commissioners a statement showing the aggregate amount, which in the judgment of said school board, it is necessary to raise *from the taxable property* of said district, and *from the payment of school fees* by the game and fish commission as hereinafter provided, to create a special fund . . . It shall thereupon be the duty of the county commissioners to levy, and to certify to the game and fish commission as to those lands and improvements thereon at the time of acquisition by the game and fish commission owned by the game and fish commission within the county, at the same time as other taxes are levied, such rate within the limits allowed by law, as will produce the aggregate amount so certified by the school board. The amount of such *special tax,* which shall be assessed to *each taxpayer* of such district, shall be placed in a separate column of the tax book, which shall be headed 'special school tax.' " (Emphasis supplied.)

Two sources are resorted to to create the special fund mentioned in the subsection: the first source is revenue raised from taxes on property; the second, the payment of school fees by the game and fish commission. The county commissioners in this matter shall make a levy "at the same time as other taxes are levied" and the county commissioners shall certify regarding certain things to the game and fish commission. Such special tax shall be assessed to each taxpayer of such district.

Subsection 2 provides that "it shall be the duty of the county assessor at the time that he values and assesses *taxable property* within the county, to value and assess

each separate tract of land as owned by the game and fish commission, and also any improvements which may have existed on such land at the time ownership of said land was assumed by the game and fish commission . . . It shall be the duty of the county commissioners *at the time taxes are levied* to certify to the game and fish commission as to those lands within the county, the amount owned by the game and fish commission as 'school fees' which amount shall be determined at such rate of valuation and assessment as it applied in the *levy of the 'special school tax.'* " (Emphasis supplied.)

Again, the legislature is seeking to reach two sources of revenue, one to arise from evaluations and assessments of "taxable property" and the other to divert from the game and fish fund moneys therein, pursuant to a formula outlined in the subsection. The "special tax," mentioned in subsections 1 and 2, takes on added significance here; differentiation between tax on the one hand and the disposition of game and fish funds on the other becomes dramatically and clarionly clear in this subsection 2.

I quote subsection 3:

"Upon receipt of a *certification of school fees due from a board of county commissioners,* the game and fish commission shall cause to have properly drawn and signed vouchers issued which the state controller shall honor by issuing warrants upon the 'game cash fund' established by section 62-2-5, which warrants shall be payable to the county treasurer of the certifying counties. Payment of such 'school fees' shall be due on the last day of February of each year. The claim established by the certificate of school fees due by the respective counties shall constitute a preferred claim on the 'game cash fund' and the certifying counties shall be treated as preferred creditors and paid in full. The game and fish commission shall have all the rights and obligations *as to valuation and assessment and as to the certificate of school fees due,* before the county

board of equalization, the state board of equalization and Colorado tax commission, as granted or imposed upon private taxpayers. It shall be the duty of the county treasurer upon receipt of payment of school fees from the 'game cash fund' to place to the credit of the proper school district the amount of 'school fees' owed on lands and improvements within the school district owned by the game and fish commission, and the amount placed to the credit of each school district from such fees shall be reported to the secretary of the district on or before the last day of March of each year." (Emphasis supplied.)

That a transfer of funds from one department of government to another is the purpose of the statute appears from the language of this subsection. A formula for determining the amount to be transferred threads through the whole section. In subsection 3, assurance of the proper amount is provided for by permitting resort to boards of equalization.

In view of what I have said, how can it be asserted that, beyond a reasonable doubt, public property is being taxed in pursuing the terms of the statute?

To construe the statute in question as one of taxing the game and fish department would be in violation of the rule that a construction consonant with the Constitution should be given rather than one violative of it when the statute under consideration lends itself to two constructions.

To construe the section in question as the imposition of a tax would lead to absurd results: it would be a useless thing for the state to tax its own property, *J. W. Perry Co. v. City of Norfolk*, 220 U.S. 472, 31 S.Ct. 465, 55 L.Ed. 548; it would effect "taking money out of one pocket and putting it into another" through the expensive and devious device of taxation, *City of Portland v. Multnomah County*, 135 Ore. 469, 296 Pac. 48, all contrary to the Constitution, when with ease the legislature could, through the exercise of its plenary

320

power, accomplish the same result by a mere transfer of funds from one department to another.

I submit that, under the very terms of the statute itself, a transfer of funds was the purpose of the statute. Conversely, a construction to the effect that an exaction was imposed upon the game and fish department is strained, unreal, and, therefore, unwarranted.

MR. JUSTICE MCWILLIAMS and MR. JUSTICE SCHAUER join in this dissent.