Charles T. COLLOPY, Appellant,

v.

WILDLIFE COMMISSION, DEPARTMENT OF NATURAL RESOURCES of the State of Colorado, Division of Wildlife, Department of Natural Resources of the State of Colorado, Appellees.

No. 79SA43.

Supreme Court of Colorado.

March 16, 1981.

Fischer & Wilmarth, Elery Wilmarth, Stephen E. Howard, Fort Collins, for appellant.

J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Lynn B. Obernyer, Asst. Atty. Gen., Denver, for appellees.

DUBOFSKY, Justice.

Appellant Charles T. Collopy (Collopy) appeals from a district court order declaring that neither Wildlife Commission Regulation 520a.24 [1] closing four square miles of Weld County to goose hunting nor state statutes prescribing specific remedies for wildlife-inflicted property damage [2] is, as applied, an unconstitutional taking or damaging of his property without just compensation, *Colo.Const.*, Art. II, Sec. 15, or in derogation of the due process and equal protection clauses of the state and federal constitutions, *Colo.Const.*, Art. II, Sec. 25; *U.S.Const.*, amend. XIV. Appellee Wildlife Commission, Department of Natural Resources of the State of Colorado (Commission) cross-appeals, contending that the district court should have dismissed the action on jurisdictional and justiciability grounds. We affirm the decision of the district court.

In 1973, Collopy purchased a 160 acre farm abutting Windsor Lake in Weld County. His tenants have cultivated beets, silage corn, barley and alfalfa on the farm. Cattle are pastured on crop residues left in the fields after harvests.

In 1968, the Commission promulgated Regulation 520a.24 completely prohibiting goose hunting within a four square mile area surrounding Windsor Lake. The boundaries of the closure coincide with several public roads while the closed area itself comprises the lake, several privately-owned farms and the Collopy property. Goose hunting is permitted on private farm land adjacent to, but outside, the closed area. The owners of these farms earn substantial incomes from the rental of "goose pits" to goose hunters.

The Windsor Lake closure was established as part of a network of closed areas scattered throughout eastern Colorado in accordance with the Commission's statutory authority to promulgate rules and regulations

---

**1.** Now in 2 C.C.R. 406–5 at 34.

**2.** Section 33–3–101, *et seq.*, C.R.S.1973.

"clos[ing] seasons on any species of wild-life in any specific locality ... when it finds after investigation that such action is necessary to assure maintenance of an adequate supply or to preserve the proper ecological balance of the environment," section 33–1–110(1)(a), C.R.S.1973. The district court found that these closures are intended to improve local goose hunting conditions by promoting expansion of the native goose population and by attracting transient populations of migratory wild geese to the state. The court also found that the Windsor Lake closure is the "hub" of the system of closed areas located in Weld and Larimer Counties. It serves as a centrally located resting area for geese which fly to and feed in other closures in the vicinity. Maintenance of a buffer zone around the lake is necessary if the closure is to fulfill its intended purpose. Allowing goose hunting within the closed area would discourage geese from resting on the lake which, in turn, would severely impair the effectiveness of the Commission's goose protection and management program in northeastern Colorado.

The average peak flock at the Windsor Lake closure is approximately 7,000 geese. The geese begin to arrive in late November and are present in large numbers throughout December and early January. Although they rest on the lake and usually fly elsewhere to feed, many geese also forage on the farms within the closed area.

Since 1973, Collopy and his tenant have sustained goose-inflicted damage to their third cutting of alfalfa and to such crop residues as beet tops and corn stalks.[3] The trial court valued the crop damage caused by the geese in 1975 and 1976 at approximately $250 per annum.

Although Collopy corresponded with the Commission in 1975, demanding payment of compensation, permission to hunt on his own farm or closure of farms outside the area boundaries to goose hunting, he did not request the administrative relief authorized by section 33–3–106, C.R.S.1973, before commencing this lawsuit.[4]

In October, 1976, Collopy filed a complaint in the Weld County District Court which, as subsequently amended, alleged that the Windsor Lake closure, in conjunction with the provisions of article 3 of title 33, C.R.S.1973, governing a property owner's remedies for wildlife-caused damages: (1) took or damaged his property for a public purpose without just compensation in violation of Colo.Const., Art. II, Sec. 15; (2) deprived him of due process of law in violation of Colo.Const., Art. II, Sec. 25; and (3) denied him equal protection of the laws in violation of Colo.Const., Art. II, Sec. 3.[5] The complaint sought a declaration that sections 33–3–104, C.R.S.1973 and 33–3–106 were unconstitutional, an injunction against continued closure of the farm to goose hunting without compensation for damages resulting from the closure, and compensatory damages for crop losses suffered between 1972 and 1976.

Collopy abandoned his claim for compensatory damages at trial. The district court then ruled that the issues to be tried would be confined to the constitutionality, as applied, of the statutes and regulations governing the Windsor Lake closure. Following a trial to court, the court held that the

3. The presence of the geese also benefits the Collopy farm. They feed on weeds and volunteer corn and their droppings fertilize the soil.

4. In 1976 the only remedy for goose-inflicted property damage codified in article 3 of title 33, C.R.S.1973, was section 33–3–106, which provided, in pertinent part:

"(1) Where wildlife is causing excessive damage to property, as determined by the division, the division is authorized to issue a permit to the property owner to kill a specified number of the wildlife causing such excessive damage."

Commission Regulation 528, promulgated on August 19, 1976, implemented this section by establishing a special season from November 6, 1976 to January 9, 1977 for geese causing damage in the North Central Colorado Special Season Area. However, Collopy never asked the Division to verify the damage to his property or to open his farm to hunting during the special season.

5. On appeal, Collopy bases his equal protection argument on U.S.Const., amend. XIV as well as the Colorado Constitution.

statutes and regulations in question had been constitutionally applied to Collopy's land.

Because we find that neither the closure nor the statutory scheme governing property owners' remedies for wildlife-caused damage unconstitutionally took or damaged Collopy's property or infringed his right to due process and equal protection of the laws, we affirm the trial court's declaratory judgment that the closure and statutory scheme are constitutional as applied to him. Similarly, because we are unpersuaded that either jurisdictional rules or justiciability principles dictated dismissal of the action, we uphold the trial court's denial of the Commission's motions to dismiss.

I.

A.

The gist of Collopy's complaint is that the regulation establishing the Windsor Lake closure and article 3 of title 33, C.R.S.1973, governing property owners' remedies for wildlife-caused damage, as applied to his farm, unconstitutionally took or damaged two property rights protected by the just compensation clause of the Colorado Constitution, Art. II, Sec. 15.

Section 33-3-102, C.R.S.1973 provides: "The state of Colorado shall be liable for certain damages caused by wildlife, but only to the extent provided in this article." Sections 33-3-103 and 33-3-104 [6] specify the circumstances in which the state may be compelled to respond in money damages for wildlife-caused injuries to property. Nothing in these statutes exposes the state to

**6.** Both sections were extensively amended in 1979. See sections 33-3-103 and 104, C.R.S. 1973 (1980 Supp.). However, the amendments were prospective only and do not concern us here.

**7.** The Division of Wildlife is the administrative arm of the Commission. See section 33-1-106, C.R.S.1973.

**8.** See n. 4, supra.

**9.** It should be noted that even if the closure were a compensable taking, it would not necessarily follow that sections 33-3-104 and 33-3-

liability for crop and crop residue damage inflicted by wild geese not under the direct control of Division of Wildlife [7] (Division) personnel.

Section 33-3-106 authorizes the issuance of permits to kill specified numbers of wildlife if the Division concludes that they are causing "excessive damage" to property.[8] Although this remedy is nominally available to property owners seeking to curtail the damage caused by wild geese foraging in their crops and residues, it affords only prospective relief; no compensation is payable for the "excessive damages" which must be incurred before the Division may authorize the destruction of the offending geese.

■ Collopy complains that sections 33-3-104 and 33-3-106 are unconstitutional because the state cannot constitutionally disclaim its obligation to pay just compensation to one whose property has been taken or damaged for a public purpose. See Board of County Commissioners v. Adler, 69 Colo. 290, 194 P. 621 (1920) (Art. II, Sec. 15 creates an exception to the state's sovereign immunity from damages liability). It follows, however, that sections 33-3-104 and 33-3-106 can be unconstitutional as applied to Collopy only if it first is determined, as a matter of law, that the Windsor Lake closure constitutes a compensable taking or damaging of Collopy's property for a public purpose.[9] The district court resolved this pivotal question adversely to Collopy. We agree.

Collopy asserts that the closure is a compensable taking or damaging of either or both of two vested property rights protect-

106 unconstitutionally curtail the state's liability for wildlife-inflicted damages. While the question is not before us, our duty to construe a statute susceptible of both constitutional and unconstitutional interpretations to avoid constitutional infirmities, Colorado State Board of Medical Examiners v. Jorgensen, 198 Colo. 275, 599 P.2d 869 (1979), would lead us to construe article 3 of title 33 to apply only to those cases in which wildlife-caused harm does not constitute a compensable taking under Colo.Const., Art. II, Sec. 15. See Board of County Commissioners v. Adler, supra.

ed by Art. II, Sec. 15: (1) an incorporeal hereditament, incident to his ownership of the underlying fee, to take wild game on his own soil (property *ratione soli* [10]) and (2) a valuable property right in the growing crops or crop residues appropriated by the geese.

Collopy does not dispute the well-established rule that "[t]he ownership of wild game is in the state for the benefit of all the people ...," *Maitland v. People*, 93 Colo. 59, 62, 23 P.2d 116, 117 (1933); *see* section 33–1–104, C.R.S.1973; [11] nor does he deny that the state has both the power and the duty to enact reasonable measures to protect and conserve wild game within its borders. *Maitland v. People, supra.* However, relying on *Alford v. Finch*, 155 So.2d 790 (Fla.1963) and *Allen v. McClellan*, 75 N.M. 400, 405 P.2d 405 (1965), Collopy argues that state ownership of wild game does not extinguish a landowner's independent common law property right to hunt such game upon his own land. Although the state may, if reasonably necessary, regulate public hunting of state-owned game by establishing closed seasons in specific localities, *see* section 33–1–110(1)(a), Collopy contends that its power to enforce closure regulations against private landowners is circumscribed by the constitutional prohibi-

tion against taking private property—here property *ratione soli*—without just compensation.[12]

■ This constitutional claim is cognizable only if it is first acknowledged that a landowner's right to hunt on his own land is a "property right" under state law. We here decide that the right to hunt wild game upon one's own land is not a property right enforceable against the state under Art. II, Sec. 15 of the Colorado Constitution.[13]

Although the issue now before us was not unequivocally decided in *Maitland v. People, supra,* this court there stated:

"The right to kill game is a *boon or privilege* granted either expressly or impliedly, by the sovereign authority and *is not a right inhering in any individual.*"

93 Colo. at 62, 23 P.2d at 117 (emphasis added). Because *Maitland*, like the present case, dealt with a claim that the state had unconstitutionally taken a landowner's crops by forbidding him to kill game on his ranch, its characterization of the right to hunt game as a "boon or privilege" rather than an individual right suggests that this court has not heretofore classified property *ratione soli* as a distinct property right ac-

---

**10.** Literally, "property *ratione soli*" denotes all property rights which inure to a landowner "on account of the soil." *Black's Law Dictionary* 1429 (rev. 4th ed. 1968). However, following the usage adopted by the Florida Supreme Court in *Alford v. Finch*, 155 So.2d 790 (Fla. 1963), we here employ the expression to designate only a landowner's putative common law property right to take wild game on his own property.

**11.** Section 33–1–104 provides: "All wildlife within this state not held by private ownership lawfully acquired is declared to be the property of this state for the use and benefit of all people...."

**12.** Since the general assembly has withheld the power of eminent domain from the Commission, *see* section 33–1–112, C.R.S.1973, Collopy intimates that he is entitled to a mandatory injunction restraining the Commission from unlawfully interfering with his right to hunt on his own farm in lieu of, if not in addition to, compensatory damages for lost goose pit rental opportunities attributable to the closure. *See Game and Fish Commission v. Farmers Irriga-*

*tion Company*, 162 Colo. 301, 426 P.2d 562 (1967). However, because we conclude that the state has not unconstitutionally taken Collopy's right to hunt on his farm, we need not now decide whether a statutorily unauthorized taking may be enjoined.

**13.** We note in passing that the Commission regulation does not wholly proscribe hunting on the Collopy farm; only goose hunting is prohibited. Thus, even if this state classified property *ratione soli* as a property right, it is questionable whether a ban on taking a single species would so substantially impair that right as to constitute a compensable taking. *Cf. Alford v. Finch, supra, Allen v. McClennan, supra.* Moreover, because a landowner's property *ratione soli* is subject to "lawful regulation," *Alford v. Finch, supra,* a closure affecting only a single species could well be deemed a reasonable police power regulation of a landowner's right to hunt on his land rather than a constitutionally impermissible appropriation of that right.

companying land ownership. *See also Game and Fish Commission v. Feast,* 157 Colo. 303, 402 P.2d 169 (1965).

Moreover, *Maitland's* characterization of the right to hunt as a privilege against the state rather than a property right comports with decisions in other jurisdictions which have rejected the argument that landowners enjoy a property right to take game on their own soil. *See Lansden v. Hart,* 180 F.2d 679 (7th Cir. 1950); *Bishop v. United States,* 126 F.Supp. 449, 130 Ct.Cl. 198 (1954) ("plaintiff's allegation ... that the right to hunt geese is a property right cannot be taken seriously in view of the Supreme Court's opinion in *Geer v. Connecticut,* 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793. . . . No citizen has a right to hunt wild game except as permitted by the state." 126 F.Supp. at 449); *State v. Herwig,* 17 Wis.2d 442, 117 N.W.2d 335 (1962) ["Hunting is a privilege against the state (commonly called hunting rights in reference to land) which the state can grant, deny or regulate—a privilege of, reducing wild life, which the hunter did not own, to possession and to ownership by a means and at a time and place which are lawful." 17 Wis.2d at 446, 117 N.W.2d at 337–38]; *State v. McKinnon,* 153 Me. 15, 133 A.2d 885 (1957); *Holbrook Island Sanctuary v. Inhabitants of Town of Brooksville,* 161 Me. 476, 214 A.2d 660 (1965) (dictum); *Bauer v. Game, Forest Station and Parks Commission,* 138 Neb. 436, 293 N.W. 282 (1940); *but see Alford v. Finch, supra; Allen v. McClellan, supra.*

Because we hold that Collopy's right to hunt wild game on his farm is not "proper-

ty", the Windsor Lake closure cannot constitute a taking of that right within the meaning of *Colo.Const.* Art. II, Sec. 15.[14]

 The second property right allegedly taken or damaged by the ban on goose hunting within the Windsor Lake closure is Collopy's interest in the crops and crop residues destroyed by geese congregating in the closed area. Landowners unquestionably possess a cognizable property interest in their crops and residues. It does not follow, however, that mere state ownership of wild game exposes it to liability for wildlife-caused crop losses. *See, e. g., Sickman v. United States,* 184 F.2d 616 (7th Cir. 1950); *State v. Rathbone,* 110 Mont. 225, 100 P.2d 86 (1940); *Leger v. Louisiana Department of Wildlife and Fisheries,* 306 So.2d 391 (La.App.1975); Annot. 57 A.L.R.2d 242 (1958).

As the *Leger* court succinctly observed: "We find nothing ... in the law which indicates that the state has a duty to harbor wild birds or wild quadrupeds or to prevent them from damaging privately owned property. If such a duty should be imposed on the state, then it would mean in many instances that the state would have to impound or confine some birds or animals, and they would thus cease to be wild creatures. . . . It would mean in some cases that the state would have to restrict or interfere with the migration or other habits of our wildlife, or it would have to destroy them."

306 So.2d at 394.

However, conceding the state's immunity from liability for fortuitous wildlife-caused

**14.** Although it is evident that the closure deprived Collopy of the opportunity to earn substantial revenues from the rental of goose pits, this alone constitutes neither a taking without just compensation nor a deprivation of property without due process of law. It is well established that the just compensation and due process clauses of the state or federal constitutions are not violated simply because a land-use regulation prevents a landowner from making the highest or most profitable use of his property. *Baum v. City and County of Denver,* 147 Colo. 104, 363 P.2d 688 (1961); *Madis v. Higginson,* 164 Colo. 320, 434 P.2d 705 (1967). These constitutional guarantees forbid only

land-use regulations which deprive a landowner of *all* reasonable use of his property. *Id.* Collopy does not allege that the closure has deprived him of all reasonable use of his farm. *Cf. Alford v. Finch, supra.*

Moreover, because the farm was already closed to goose hunting when it was purchased in 1973, familiar principles of zoning law suggest that Collopy's inability to rent goose pits to hunters is a non-compensable, self-inflicted hardship. *See Nopro Co. v. Town of Cherry Hills Village,* 180 Colo. 217, 504 P.2d 344 (1973); *City and County of Denver v. McDonald's Corporation,* 177 Colo. 1, 491 P.2d 1375 (1972).

property damage, Collopy argues that the just compensation clause curbs the state's power to implement otherwise valid wildlife management policies which, as applied, result in unduly burdensome, uncompensated harm to crops and residues. In this case, he contends, the closure has simultaneously inflated the goose population foraging on his farm and deprived him of the single effective means of deterring the resulting destruction. For all practical purposes, he continues, the closure has transformed his farm into a *de facto* game refuge and appropriated his crops and residues as fodder for its inhabitants. This, he concludes, is in excess of the state's legitimate police powers under section 33–1–110 and constitutes a taking or damaging of private property without just compensation in contravention of *Colo.Const.*, Art. II, Sec. 15.

To bulwark his argument, Collopy cites several factually similar cases which have held that the state cannot use its power to regulate hunting to establish a game refuge on private property if wildlife congregating on the refuge cause substantial uncompensated crop damage. *See State v. Herwig, supra* (water fowl caused crop damage in an amount of $500 annually); *Shellnut v. Arkansas State Game and Fish Commission*, 222 Ark. 25, 258 S.W.2d 570 (1953). Although these cases proceed from the well-settled premise that:

"[T]he nature and extent of the damage flowing from an act of government may, in a given case, render the act a taking of private property. There is a limit to the extent to which the state may restrict the use of property or damage property under the police power. What amounts to a deprivation of property without due process of law is often difficult to determine and the determination largely depends upon the nature of the particular case."

*State v. Herwig, supra*, 17 Wis.2d at 447, 117 N.W.2d at 338; *see Combined Communications Corp. v. City and County of Denver*, 189 Colo. 462, 542 P.2d 79 (1975), the premise merely restates the question; it does not delineate the precise circumstances under which a land-use regulation deprives a landowner of property without due proc-

ess of law or takes his property without just compensation.

In zoning cases we have held that there are two means of establishing that a land-use regulation is unconstitutional.

"First it may be shown that it is not substantially related to the public health, safety and welfare.

\* \* \* \* \* \*

The second method is to show that it precludes the use of [the] property for any reasonable purpose."

*Ford Leasing Development Company v. Board of County Commissioners*, 186 Colo. 418, 426, 528 P.2d 237, 241 (1974). The same approach is applicable to the Windsor Lake closure.

■ First, there is no doubt that the Commission possesses the statutory authority to close the hunting season on a species of game in a specific locality to assure maintenance of an adequate supply, section 33–3–110(1)(a), and to protect and enhance the game population for the use, benefit and enjoyment of Colorado residents and visitors. Section 33–1–101, C.R.S.1973. It is equally clear that these objectives are within the purview of the state's police power. Because ample trial evidence proved that the Windsor Lake closure was not only a rational but an effective and even indispensable means of accomplishing these legislative objectives, we conclude that the closure is substantially related to the public health, safety and welfare.

■ The remaining question is whether the closure, as applied to Collopy's farm, so unreasonably deprives him of the use of his crops and residues as to overstep the constraints the just compensation clause places upon the exercise of the state's police power. *See Combined Communications Corp. v. City and County of Denver, supra*. Our resolution of this question is guided by our earlier decision in *Maitland v. People, supra*.

In *Maitland*, a landowner challenged as a taking an act of the legislature establishing a game refuge and prohibiting hunting on certain private lands. It was uncontrovert-

ed that the creation of the refuge had led to an increase in wildlife populations within the closed area resulting in far greater damage to the landowner's crops than would otherwise have been sustained. Nevertheless, this court held:

"Whatever legislative protection is accorded game, some harm is usually done to some person as an incident to such protection.... But such incidental injuries are not sufficient to render the protecting statute unconstitutional."

93 Colo. at 63, 23 P.2d at 117. Other courts have reached similar conclusions; *see Barrett v. State*, 220 N.Y. 423, 116 N.E. 99 (1917); *Bishop v. United States, supra* (in which one of the taking claims was premised on goose-inflicted crop damage); *Cook v. State*, 192 Wash. 602, 74 P.2d 199 (1937); *Platt v. Philbrick*, 8 Cal.App.2d 27, 47 P.2d 302 (1935),[15] and, in the present case, we see no reason to depart from our holding in *Maitland*.

Although we are mindful that a different result may be commended by Art. II, Sec. 15 if the wildlife-inflicted property damage accompanying a closure were to prove more substantial than that here incurred by Collopy, *cf. Combined Communications Corp. v. City and County of Denver, supra*, we conclude that losses of $250 *per annum* fall well within the ambit of what Justice Holmes once aptly described as "the petty larceny of the police power."[16]

### B.

Collopy also argues that the Windsor Lake closure denies him the equal protection of the laws guaranteed by *Colo.Const.* Art. II, Sec. 25, and *U.S.Const.* Amend. XIV. We find his argument unpersuasive.

The gist of Collopy's charge is that the closure boundaries—which coincide with public roads encircling the lake—are arbitrarily and irrationally drawn. If the purpose of establishing a buffer zone is to prevent hunting and harassment which would discourage the geese from resting on the lake, Collopy contends, the Commission's choice of public roads as the closure's boundaries is irrational because it permits hunting on lands nearer the lakeshore than other land, including his farm, on which hunting is banned. The Commission answers, *inter alia*, that the choice of the roads as boundary lines was dictated by the need to fix boundaries which the public could readily recognize and obey, as well as the need to establish a buffer zone of certain dimensions around the lake.

█ It is well-settled that a regulatory classification which neither impinges on fundamental rights nor affects suspect classes will be upheld "if the distinctions made ... have a reasonable basis and are rationally related to a legitimate state interest." *Manor Vail Condominium Association v. Town of Vail*, Colo., 604 P.2d 1168, 1171 (1980). As we have already observed, the purposes served by the Windsor Lake closure are within the purview of the state's police powers. The furtherance of those purposes requires that geese on the lake be protected against harassment by goose hunting on adjoining lands. It is neither arbitrary nor irrational to designate as the boundary of the closed area prominent landmarks which members of the hunting public can easily recognize and respect. While the boundaries selected for this purpose may not prevent harassment as effectively as boundaries everywhere equidistant from the shoreline, regulatory classifications are not unconstitutional simply because they are drawn with less than mathematical precision. *Manor Vail Condominium Association v. Town of Vail, supra*.

█ For the foregoing reasons we affirm the district court's decision that the regulations and statutes governing the establishment of the Windsor Lake closure and governing goose hunting therein are constitutional as applied to the Collopy farm.

---

15. *But see State v. Herwig, supra; Shellnut v. Arkansas State Game and Fish Commission, supra.*

16. *Holmes-Laski Letters* (ed. M. DeWolfe Howe 1963).

## II.

The Commission, by cross-appeal, contends that the district court should have dismissed Collopy's action without reaching and deciding the merits of his constitutional attack on the Windsor Lake closure. We disagree.

The Commission argues that Collopy's challenge to the constitutionality of Regulation 520a.24 establishing the Windsor Lake closure is untimely. Because Regulation 520a.24 was promulgated after rule-making proceedings held in 1968, the Commission contends, Collopy's 1976 lawsuit is barred by section 3–16–5(4), C.R.S.1963. That section provided:

"Any party adversely affected or aggrieved by agency action may commence an action for judicial review in the district court . . . *within 60 days after such agency action becomes effective.*" [17]

(Emphasis added.)

The Commission apparently views compliance with the 60-day provision as an unswerving jurisdictional prerequisite to C.R.C.P. 57 review of administrative regulations promulgated in accordance with section 24–4–103, C.R.S.1973. It reasons to this conclusion from several premises. First, it observes that because rule-making is "agency action," agency rules and regulations are reviewable under section 24–4–106(4), C.R.S.1973. *See, e. g., C F & I Steel Corp. v. Colorado Air Pollution Control Commission,* Colo., 610 P.2d 85 (1980).[18] Second, the Commission points out that although a C.R.C.P. 57 complaint may sometimes be joined with an action for judicial review under section 24–4–106(4), *see C F & I Steel Corp., supra; Utah International v. Board of Land*

*Commissioners,* 41 Colo.App. 72, 579 P.2d 96 (1978), the C.R.C.P. 57 complaint, like the action for judicial review, will be barred if it has not been filed within the time fixed by section 24–4–106(4). *See Greyhound Racing Association v. Colorado Racing Commission,* 41 Colo.App. 319, 589 P.2d 70 (1978); *see also Norby v. City of Boulder,* 195 Colo. 231, 577 P.2d 277 (1978) (a C.R. C.P. 57 complaint joined with C.R.C.P. 106(a)(4) action for certiorari review of a municipal rezoning decision is untimely unless filed within 30 days of the decision).

In *Greyhound Racing Association* the court of appeals held that a party could not evade section 24–4–106(4)'s 60-day provision by the simple expedient of amending an untimely petition for judicial review of an agency licensing decision to state a claim for declaratory relief under C.R.C.P. 57. However, *Greyhound Racing Association,* like *Norby v. City of Boulder, supra,* dealt with a request for declaratory relief from a *quasi-judicial* decision of a non-judicial tribunal. Nothing in that case, *Norby,* or our other cases implies that the *quasi-legislative* actions of administrative agencies are insulated from judicial scrutiny by expiration of the 60-day filing period prescribed by section 24–4–106(4). Rule-making conducted in accordance with section 24–4–103 is quasi-legislative, not quasi-judicial, in character. While agency rules and regulations are indeed reviewable under section 24–4–106(4), *see, e. g., C F & I Steel Corp. v. Colorado Air Pollution Control Commission, supra ;* n. 18, *supra,* expiration of that statute's 60-day filing period does not invariably bar as untimely a C.R.C.P. 57 action attacking the constitutionality of an admin-

---

17. This section was reenacted without substantial revisions as section 24–4–106(4), C.R.S. 1973. In 1979 the limitations period was shortened to 30 days. *See* section 24–4–106(4), C.R. S.1973 (1980 Supp.). For purposes of clarity, relevant provisions of title 3, article 16, C.R.S. 1963 will be cited to title 24, article 4, C.R.S. 1973.

18. The 1979 amendments to the State Administrative Procedure Act, section 24–4–101, *et seq.,* C.R.S.1973, clearly contemplate review of

administrative regulations promulgated pursuant to section 24–4–103 under section 24–4–106(4). *See, e. g.,* sections 24–4–102(3.5), C.R. S.1973 (1980 Supp.) (defining "aggrieved for the purposes of judicial review of rule making" to mean actual or threatened loss or injury), and 24–4–103(5) (1980 Supp.) (providing that a rule-making becomes "final agency action for judicial review purposes" upon the effective date of the regulation promulgated).

istrative regulation promulgated by section 24-4-103 rule-making.[19]

Although the question of untimeliness was not explicitly raised in *Moore v. District Court*, 184 Colo. 63, 518 P.2d 948 (1974), we there held that the constitutionality of regulations promulgated by the State Board of Pharmacy prohibiting pharmacies from advertising prescription drug and medicine prices could be attacked in a declaratory judgment action brought more than four years after the regulations had become effective. *See also State Board of Cosmetology v. District Court*, 187 Colo. 175, 530 P.2d 1278 (1975).[20] In another context, we recently held that the law does not require a person to risk criminal or civil penalties in order to test the legality of agency regulations. *C F & I Steel Corp. v. Colorado Air Pollution Control Commission, supra.* It would be anomalous if we were now to rule that the expiration of a 60-day filing period precludes judicial review of an allegedly unconstitutional administrative regulation unless the person aggrieved by the regulation is willing to risk the consequences of an act of disobedience.

█ We therefore hold that a person, like Collopy, to whom an agency regulation is allegedly being unconstitutionally applied, need not defy that regulation to obtain a judicial determination of its validity, but may instead commence a suit under C.R.C.P. 57. An action for declaratory relief brought under these circumstances will not be barred because the time period prescribed by section 24-4-106(4) has elapsed since the agency regulation under attack became effective.

The Commission next urges that Collopy's lawsuit should have been dismissed because he failed to "elect remedies." While its argument is not entirely clear, the Commission apparently contends that declaratory relief was not available because Collopy possessed other established common law and statutory remedies for the alleged taking—*i. e.*, an inverse condemnation proceeding or an action for judicial review of agency action under section 24-4-106(4), *see Taylor v. Tinsley*, 138 Colo. 182, 330 P.2d 954 (1958). Second, it argues that even if declaratory judgment were a proper remedy, the district court erroneously permitted Collopy to join a claim for compensatory damages with his C.R.C.P. 57 claim. Damages, the Commission asserts, could only be awarded in an inverse condemnation proceeding or a tort action against the Commission. We disagree.

Under the circumstances of this case, a section 24-4-106(4) petition for judicial review of agency action is not the proper procedure for obtaining a declaration that the Windsor Lake closure, as applied to the Collopy farm, violates Art. II, Sec. 15 of the Colorado Constitution. The courts of this state have on several occasions held that the nominal availability of judicial review under section 24-4-106(4) or C.R.C.P. 106(a)(4) does not preclude a C.R.C.P. 57 action seeking declaratory relief if, in the context of a particular controversy, the remedy afforded by section 24-4-106(4) or certiorari review would be inadequate. *See Norby v. City of Boulder, supra; Utah In-*

19. Similarly, even though C.R.C.P. 106(a)(4) review of a quasi-judicial municipal rezoning decision is precluded after 30 days have elapsed, *see, e. g., Snyder v. City of Lakewood*, 189 Colo. 421, 542 P.2d 371 (1975), we have never suggested that a C.R.C.P. 57 action attacking a general zoning ordinance as unconstitutional as applied is untimely if filed more than 30 days after the zoning legislation has been enacted. *See Snyder v. City of Lakewood, supra; see also* 4 Anderson, *American Law of Zoning*, § 25.05 (2d ed. 1977).

20. The *Moore* case illustrates the constitutional difficulties implicit in a holding that agency regulations are insulated from constitutional

scrutiny once the truncated filing period established by section 24-4-106(4) has elapsed. The United States Supreme Court has since held that regulations like those challenged in *Moore* impermissibly curtail protected commercial expression. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Yet, if we were to adopt the theory advanced by the Commission, the constitutionality of the Board of Pharmacy's regulations could be challenged, if at all, only as a defense to a disciplinary action brought against an erring pharmacist. The wisdom and constitutional validity of any such ruling would be debatable.

ternational v. Board of Land Commissioners, supra; Hermanson v. Board of County Commissioners, 42 Colo.App. 154, 595 P.2d 694 (1979).

■ The Commission's assertion that Collopy should have petitioned for judicial review under section 24–4–106(4) is simply untenable. The only "agency action" which could have been reviewed in a section 24–4–106(4) proceeding was the promulgation of Regulation 520a.24. However, Collopy's constitutional objection was not directed to the face of the regulation, but to its application over a period of several years—i. e., to its long-term impact on his farm. As the Hermanson court noted, whether land-use regulations constitute a taking "is a question of degree which requires an evidentiary determination." 42 Colo.App. at ——, 595 P.2d at 696. See also U. S. Disposal v. City of Northglenn, 193 Colo. 277, 567 P.2d 365 (1977) (Erickson, J., dissenting; "the question of whether the economic injury alleged in this case constitutes 'damage' within the meaning of the constitutional provision is one of law. However, the legal issue cannot be resolved in a complete [factual] vacuum." 193 Colo. at 285, 567 P.2d at 370–71.) The factual bases for Collopy's Art. II, Sec. 15 claim had not arisen and could not be foretold with any confidence when the rule-making hearings were held in 1968. Yet the record of this rule-making would incorporate the only factual evidence properly before the reviewing court in a section 24–4–106(4) action. See sections 24–4–106(6) and (7), C.R.S.1973. To compel Collopy to litigate this controversy on the basis of a factual record compiled at a hearing conducted several years before the damage constituting the alleged taking occurred would be unjust. We therefore hold that Collopy was not obligated to challenge the application of the closure regulation to his farm by a petition for judicial review of agency action under section 24–4–106(4).[21]

■ The second "established remedy" cited by the Commission, an action in in-

verse condemnation, could not be invoked in this case to rectify the alleged appropriation of either Collopy's property right to take game on his farm or his crops and crop residues. Although it is true that an inverse condemnation proceeding is ordinarily the only remedy available to a litigant whose property has been taken for a public use without just compensation, Ossman v. Mountain States Telephone & Telegraph Company, 184 Colo. 360, 520 P.2d 738 (1974), Collopy's action for declaratory, injunctive and damages relief falls within an exception to this general rule. It is well-settled in Colorado that:

"Where there is no power on the part of a state agency to condemn private property for a claimed public use, a property owner whose property has been damaged by such agency cannot be held to have commenced an action for 'inverse condemnation' when he seeks to recover the damages actually sustained by him. There can be no 'inverse condemnation' in a situation where no right exists in a governmental agency to proceed under eminent domain."

Game and Fish Commission v. Farmers Irrigation Company, supra, 162 Colo. at 310, 426 P.2d at 566; see also Hermanson v. Board of County Commissioners, supra (dictum). The Commission concedes that it lacks the power of eminent domain. To compel Collopy to proceed in inverse condemnation is therefore not only unwarranted but, had a taking occurred, would enable the Commission to acquire indirectly property rights the legislature has denied it the power to acquire by direct condemnation.

■ Because Collopy waived his damage claim at trial and because the district court resolved the merits of his taking claim in favor of the Commission, we need not decide whether the lower court had the power to award damages or issue a mandatory injunction in the course of these proceedings. The district court correctly permitted Collopy to seek a declaration under C.R.C.P. 57 that the Windsor Lake closure, as ap-

---

**21.** By analogy, if C.R.C.P. 106(a)(4) review is inadequate to resolve a challenge to a rezoning decision, this court has held that a trial de novo under C.R.C.P. 57 is a proper and effective remedy. See Norby v. City of Boulder, supra. See also Ford Leasing Development Company v. Board of County Commissioners, supra.

plied to his property, was an unconstitutional taking or damaging of private property without just compensation. It did not err by refusing to compel Collopy to "elect remedies."

The Commission next contends that Collopy's action should be dismissed as non-justiciable because he failed to exhaust his administrative remedies before commencing this action in 1976. Specifically, the Commission argues that Collopy never sought relief under section 33–3–106 authorizing issuance of a permit to kill wildlife causing excessive damage and Regulation 528 establishing a special hunting season for geese causing damage. We are not persuaded that authorization of a special hunting season pursuant to section 33–3–106 and Regulation 528 would have resolved Collopy's constitutional objections to the Windsor Lake closure.[22]

 Although this court has adhered rather strictly to the doctrine of exhaustion of remedies, *Denver-Laramie-Walden Truck Line, Inc. v. Denver-Fort Collins Freight Service, Inc.*, 156 Colo. 366, 399 P.2d 242 (1965), "There are few absolutes in the law and the rule that an administrative remedy must be exhausted before recourse is had to the courts is not one of them," *Poe v. Baltimore*, 241 Md. 303, 308, 216 A.2d 707, 709 (1966). The principal justification for the exhaustion doctrine is that, by affording administrative agencies an opportunity to correct their errors, it minimizes the risk of premature judicial intervention in the administrative process. *Moschetti v. Liquor Licensing Authority of the City of Boulder*, 176 Colo. 281, 490 P.2d 299 (1971). This justification becomes less persuasive when existing administrative remedies are ill-adapted to providing the relief sought, *Denver v. Stackhouse*, 135 Colo. 289, 310 P.2d 296 (1957), and when the matter in contro-

versy raises questions of law rather than issues committed to administrative discretion and expertise, *Hamilton v. City and County of Denver*, 176 Colo. 6, 490 P.2d 1289 (1971).

 Because the disposition of Collopy's challenge to the constitutionality of the closure depends in part upon the resolution of certain questions of law and because a special hunting season affords no retrospective, compensatory relief for accrued, excessive crop damages attacked as an uncompensated taking, we hold that the district court correctly refused to dismiss Collopy's lawsuit for failure to exhaust his administrative remedies.

We find the other allegations of error raised by the Commission's cross-appeal to be without merit.

Judgment affirmed.

---

22. Collopy also contends that section 33–3–106 is an overly broad and hence facially infirm delegation of legislative power to an administrative agency, charging that it invests the Division with uncanalized discretion to determine whether or not damage is excessive. The unconstitutionality of the remedy, Collopy continues, excuses his failure to exhaust it. However, we need not reach this constitutional question. Because we fail to perceive any non-

speculative injury-in-fact to Collopy's legally protected interests which can intelligibly be traced to the mere existence of section 33–3–106, we hold that Collopy lacks standing to challenge the statute's facial constitutionality. *See Cloverleaf Kennel Club v. Colorado Racing Commission*, Colo., 620 P.2d 1051 (1980); *Wimberly v. Ettenberg*, 194 Colo. 163, 570 P.2d 535 (1977); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).